# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY

JANE DOE (A.A.M.) an individual,

Plaintiff,

v.

CIVIL ACTION NO:

WYNDHAM HOTELS & RESORTS, INC.;
DAYS INNS WORLDWIDE, INC.; AMBM
INVESTMENT COMPANY, LLC d/b/a
DAYS INN; BINU GEORGE, Individually;
MICHAEL ABRAHAM, Individually;S G
HOSPITALITY, LLC d/b/a DAYS INN;
MMSD CORPORATION d/b/a DAYS INN;
D. LAXMI, INC. d/b/a DAYS INN;
ASHVIN KUMAR PATEL, Individually;
KANTILAL PATEL, Individually; AND
HOTEL OM SAI RAM LLC d/b/a DAYS
INN,

Defendants.

## PLAINTIFF'S ORIGINAL COMPLAINT

Plaintiff Jane Doe (A.A.M.) files this Original Complaint against WYNDHAM HOTELS & RESORTS, INC.; DAYS INNS WORLDWIDE, INC.; AMBM INVESTMENT COMPANY, LLC d/b/a DAYS INN; BINU GEORGE, Individually; MICHAEL ABRAHAM, Individually; S G HOSPITALITY, LLC; MMSD CORPORATION; D. LAXMI, INC. d/b/a DAYS INN; ASHVINKUMAR PATEL, Individually; KANTILAL PATEL, Individually; AND HOTEL OM SAI RAM LLC d/b/a DAYS INN, as Defendants and respectfully shows the Court as follows:

## SUMMARY

1. Jane Doe (A.A.M.) files this civil lawsuit seeking compensation for the harm she suffered as a result of the sex trafficking she endured at Days Inn hotels owned, operated, maintained, and controlled by Defendants and their agents and employees.

1

2.      Sex trafficking is the recruitment, harboring, transportation, provision, obtaining, patronizing, or soliciting of a person for the purposes of causing the person to engage in a commercial sex act either (1) before the person turns 18 years old; or (2) through force, fraud, or coercion.[1] Traffickers or 'pimps' use threats, violence, manipulation, lies, debt bondage, and other forms of coercion to compel adults and children to engage in commercial sex acts against their will.

3.      Some victims are brought into trafficking through abduction or use of physical violence, while many other trafficking relationships begin with a false promise of a romantic relationship or financial security.[2] Traffickers often prey on individuals with vulnerabilities that make them more susceptible to coercion and control.[3]

4.      Traffickers then use a variety of techniques to maintain control over their victims. Some traffickers use physical violence and overt threats to control their victims, while others use more subtle forms of fraud and coercion.[4] Many traffickers use techniques to undermine victims' ability to think and act independently through repetitive infliction of psychological trauma. These techniques can include high levels of control, exposure to chronic stress and threat, isolation, provocation of fear, and the creation of a sense of helplessness in victims.[5]

5.      Sex trafficking has become a public health crisis that has reached epidemic proportions in the United States. It is now widely recognized, including by Congress and many state legislatures, that combating sex trafficking requires more than just criminal penalties for pimps and sex buyers.

[1] 18 U.S.C. §1591; 22 U.S.C. § 7102.
[2] The National Prevention Toolkit, Sex Trafficking, https://nationaltoolkit.csw.fsu.edu/leo/part-2/sex-trafficking
[3] Polaris Project, Sex Trafficking: The Basics, https://polarisproject.org/understanding-human-trafficking/
[4] The National Prevention Toolkit, Sex Trafficking, https://nationaltoolkit.csw.fsu.edu/leo/part-2/sex-trafficking
[5] Elizabeth Hopper, Ph.D. & José Hidalgo, M.D., *Invisible Chains: Psychological Coercion of Human Trafficking Victims*, 1 Intercultural Hum. Rts. L. Rev. 185, 191 (2006).

6. Since 2003, federal law, through the Trafficking Victims Protection Reauthorization Act ("TVPRA"), 18 U.S.C. §1581, et seq, has provided victims of sex trafficking a civil remedy against perpetrators of criminal sex trafficking.

7. In 2008, Congress recognized the need to extend liability beyond sex buyers and sellers and intentionally expanded the scope of the TVPRA to reach those who—while not criminally liable under the TVPRA—financially benefit from participation in a venture that they know or *should know* engages in criminal sex trafficking.

8. As discussed herein, Defendants derived financial benefit from facilitating sex trafficking by providing venues where traffickers could exploit victims, including victims like Jane Doe (A.A.M.) with minimal risk of detection or interruption. Defendants continued supporting traffickers, including Jane Doe (A.A.M.)'s trafficker, despite evident and apparent signs of widespread and ongoing sex trafficking in these hotels. Defendants were, therefore, knowingly receiving a benefit from participation in a venture that Defendants knew or should have known was engaged in sex trafficking.

9. Defendants had the knowledge and opportunity to prevent the severe and permanent harm that Jane Doe (A.A.M.) experienced as the result of continuous sexual exploitation. Defendants failed to do so. Instead, Defendants benefited from facilitating that sex trafficking. Accordingly, Jane Doe (A.A.M.) files this lawsuit.

## **PARTIES**

10. Plaintiff, Jane Doe (A.A.M.) is a resident of Texas. She may be contacted through her lead counsel, whose information is contained below.

11. Jane Doe (A.A.M.) is a victim of sex trafficking under 18 U.S.C. §1591(a) because she was harbored, transported, or provided for the purpose of causing her, through force, fraud or coercion, to commit a commercial sex act.

12. The trafficking of Jane Doe (A.A.M.) occurred in or affected interstate commerce.

13. Given the nature of the allegations in this lawsuit, there is a collective and compelling interest in not publicly revealing the identity of Jane Doe (A.A.M.).

14. Wyndham Hotels & Resorts, Inc. is a for-profit Delaware corporation with its principal place of business in Parsippany, New Jersey. Defendant Wyndham Hotels and Resorts, Inc. may be served through its registered agent for service Corporate Creations Network Inc. at 3411 Silverside Road, Rodney Building #104, Wilmington, Delaware 19810.

15. All references to Wyndham Hotels and Resorts, Inc. include any department, division, office, agency, subsidiary, corporate affiliate, predecessor corporation, or successor corporation, whether domestic, foreign, and/or international. The term also includes any director, officer, agent (either with direct/actual authority or implied/apparent authority), employee, person, firm, or corporation acting on behalf of Wyndham Hotels and Resorts, Inc. now or at any time relevant to the claims herein.

16. Days Inns Worldwide, Inc. is a for-profit Delaware corporation with its principal place of business in Parsippany, New Jersey. Defendant Days Inns Worldwide, Inc. may be served through its registered agent for service Corporate Creations Network Inc. at 1521 Concord Pike, Suite 201, Wilmington, Delaware 19803.

17. All references to Days Inns Worldwide, Inc. include any department, division, office, agency, subsidiary, corporate affiliate, predecessor corporation, or successor corporation, whether domestic, foreign, and/or international. The term also includes any director, officer, agent

4

(either with direct/actual authority or implied/apparent authority), employee, person, firm, or corporation acting on behalf of Days Inns Worldwide, Inc. now or at any time relevant to the claims herein.

18.     Wyndham Hotels & Resorts, Inc. and Days Inns Worldwide, Inc. will be referred to as "Wyndham" or "Franchisor Defendants." Upon information and belief, the Franchisor Defendants owned, operated, controlled, and/or managed the Days Inn located at 4039 E Houston St, San Antonio, TX 78220 and 6023 W Interstate 10, San Antonio, TX 78201.

19.     AMBM Investment Company, LLC d/b/a Days Inn is a for-profit Florida limited liability company with its principal place of business in Hollywood, FL. AMBM Investment Company, LLC may be served through its registered agent for service Binu George at 2119 North 36 Avenue, Hollywood, FL 33021. At all relevant times, Defendant AMBM Investment Company, LLC d/b/a Days Inn owned the Days Inn located at 4039 E Houston St, San Antonio, TX 78220.

20.     Binu George is an individual who resides in Texas and may be served at 4039 E Houston, San Antonio, TX 78220 or wherever they may be found. Upon reason and belief, Defendant Binu George was a manager of Defendant AMBM Investment Company, LLC d/b/a Days Inn.

21.     Michael Abraham is an individual who resides in Pennsylvania and may be served at 30 Liberty Drive, Churchville, PA 18966 or wherever they may be found. Upon reason and belief, Defendant Michael Abraham was a manager of Defendant AMBM Investment Company, LLC d/b/a Days Inn.

22.     S G Hospitality, LLC d/b/a Days Inn is a for-profit Texas limited liability company with its principal place of business in San Antonio, TX. S G Hospitality, LLC d/b/a Days Inn may be served through its registered agent for service Thomas G. Thamaravelil at 13707 Ridge Chase,

5

San Antonio, TX 78230. At all times relevant, Defendant S G Hospitality, LLC d/b/a Days Inn owned the Days Inn located at 4039 E Houston St, San Antonio, TX 78220.

23.    MMSD Corporation d/b/a Days Inn is a for-profit Texas corporation with its principal place of business in Granbury, TX. MMSD Corporation d/b/a Days Inn may be served through its registered agent for service Pius U. Dsouza at 1335 N. Plaza Drive, Granbury, TX 76048. At all times relevant, Defendant MMSD Corporation d/b/a Days Inn owned the Days Inn located at 4039 E Houston St, San Antonio, TX 78220.

24.    D. LAXMI, Inc. d/b/a Days Inn is a for-profit Texas corporation with its principal place of business in San Antonio, TX. D. LAXMI, Inc. may be served through its registered agent for service Navnit Patel at 6023 W Interstate 10, San Antonio, TX 78201. At all times relevant, Defendant D. LAXMI, Inc. owned the Days Inn located at 6023 W Interstate 10, San Antonio, TX 78201.

25.    Ashvin kumar Patel is an individual who resides in Texas and may be served at 1931 Oak Flat Rd, San Antonio, TX 78251or wherever they may be found. Upon reason and belief, Defendant Ashvinkumar Patel was a manager of Defendant D. LAXMI, Inc. d/b/a Days Inn and Defendant Hotel OM SAI RAM LLC d/b/a Days Inn.

26.    Kantilal Patel is an individual who resides in Texas and may be served at 6023 W Interstate 10, San Antonio, TX 78201or wherever they may be found. Upon reason and belief, Defendant Ashvinkumar Patel was a manager of Defendant D. LAXMI, Inc. d/b/a Days Inn

27.    Hotel OM SAI RAM LLC d/b/a Days Inn is a for-profit Texas limited liability company with its principal place of business in San Antonio, TX. Hotel OM SAI RAM LLC d/b/a Days Inn may be served through its registered agent for service Ashivin Patel at 6023 W Interstate

6

10, San Antonio, TX 78201. At all times relevant, Defendant Hotel OM SAI RAM LLC owned the Days Inn located at 6023 W Interstate 10, San Antonio, TX 78201.

28.    AMBM Investment Company, LLC d/ba Days Inn, Binu George, Michael Abraham, S G Hospitality, LLC d/b/a Days Inn, MMSD Corporation d/b/a Days Inn, D. LAXMI, Inc. d/b/a Days Inn, Ashvin kumar Patel, Kantilal Patel and Hotel OM SAI RAM LLC will collectively be referred to as "Franchisees" or "Franchisee Defendants."

29.    Wyndham Defendants and Franchisee Defendants will collectively be reffered to as "Defendants."

## <u>JURISDICTION AND VENUE</u>

30.    This Court has jurisdiction over this lawsuit pursuant to 28 U.S.C. § 1331 because this action involves a federal question under the TVPRA.

31.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because one or more Defendants reside in this district.

32.    All Wyndham Defendants have the same principal place of business, which is in Parsippany, New Jersey, within the District of New Jeresy. Therefore, each of the Wyndham Defendants is a resident of the District of New Jersey for the purpose of § 1391(b)(1).

33.    Under 28 U.S.C. § 1391(c)(2), Franchisee is a resident of New Jersey for the purpose of § 1391(b)(1) because the Court has personal jurisdiction over each of the Franchisees.

34.    Under § 1391(d), Franchisees are residents of New Jersey for the purpose of § 1391(b)(1) because, if the District of New Jersey was a separate state, Franchisees' contacts with the district would be sufficient to subject it to personal jurisdiction.

35.    Plaintiff's claims against Franchisees arise out of Franchisees' contacts with New Jersey through Franchisees' relationship with the Wyndham Defendants, which has its principal place of business in the District of New Jersey. Franchisees' participation in a venture with the

7

Wyndham Defendant operating the subject hotel occurred, in substantial part, in New Jersey because upon information and belief:

a. Franchisees actively sought out a franchising relationship by contacting the Wyndham Defendants in New Jersey;

b. Franchisees acknowledged that the negotiation, execution, and acceptance of the franchising agreement occurred in the District of New Jersey;

c. Franchisees agreed that its ongoing performance of the franchising agreement would take place, in part, in the District of New Jersey;

d. The franchising agreements had a choice of law provision selecting the law of New Jersey as the governing law;

e. The franchising agreements required Franchisees to report information to the Wyndham Defendants in New Jersey, including information about all incidents involving safety, security, public relations, or serious injuries to persons or property that occur at, or involve, the subject motel, including those involving sex trafficking victims like Jane Doe (A.A.M.);

f. Franchisees agreed to submit all notices required under the franchising agreement to the Wyndham Defendants in the District of New Jersey;

g. Franchisees were required to attend training and meetings in New Jersey;

h. The Wyndham Defendants dictated policies related to safety, security, human trafficking, employee training and Franchisees' response, as well as other subjects from their principal place of business in the District of New Jersey;

i. Franchisees had an ongoing obligation to participate in centralized programs operated by the Wyndham Defendants from their principal place of business in the District of New Jersey;

j. Franchisees were required to purchase insurance on behalf of one or more New Jersey entities (the Wyndham Defendants);

k. Reservation information for rooms at the subject motel passed through a system operated and managed by Wyndham from its principal place of business in New Jersey;

l. Payment information for rooms at the subject motel passed through a system operated and managed by Franchisor Defendants in New Jersey;

m. The benefit that Franchisees received from room rentals was governed by the New Jersey franchising agreement;

8

n. Franchisees agreed to make all payments due under the franchising agreement at the Wyndham principal place of business in the District of New Jersey;

o. Franchisees' operation of the subject motel were controlled and/or influenced by many policies set and enforced by the Wyndham Defendants from their principal place of business in Parsippany, New Jersey; and

p. Franchisees signed a software licensing agreement with the Wyndham Defendants for the property management software the Wyndham Defendants required Franchisee to use when operating the motel, including, but not limited to, when booking rooms at the hotel and processing payment for those rooms. Franchisee agreed to file any lawsuit arising from the licensing agreement in the Eastern District of New Jersey and waived personal jurisdiction and venue objections.

36. Upon information and belief, Franchisee Defendants contractually consented to jurisdiction in the District of New Jersey.

## **STATEMENT OF FACTS**

**I.    Jane Doe (A.A.M.) was a Victim of Unlawful Sex Trafficking at a Hotel Owned, Operated, Managed and Controlled by Defendants.**

37. Jane Doe (A.A.M.) met her first traffickers in 2008. Jane Doe (A.A.M.) was approached by a man while working as a dancer while having no reason or knowledge to suspect that she would be forced into sex trafficking. However, from January 2008 to December 2014 Jane Doe (A.A.M.) was forced to engage in commercial sex acts numerous times a day by her trafficker and another trafficker who would physically and mentally abuse her. Jane Doe was in constant fear for her life.

38. At various times between January 2010 to December 2014, Jane Doe (A.A.M.) was continuously and unlawfully trafficked at the Days Inn located at 4039 E Houston St, San Antonio, TX 78220 ("Houston St Days Inn"). Jane Doe (A.A.M.) was trafficked through force and coercion by her trafficker and required to engage in numerous commercial sex acts for his financial benefit at the Houston St Days Inn.

9

39.    At various times between January 2010 to December 2014, Jane Doe (A.A.M.) was continuously and unlawfully trafficked at the Days Inn located at 6023 W Interstate 10, San Antonio, TX 78201 ("I-10 Days Inn"). Jane Doe (A.A.M.) was trafficked through force and coercion by her trafficker and required to engage in numerous commercial sex acts for his financial benefit at the I-10 Days Inn.

40.    The Houston St Days Inn and I-10 Days Inn will be referred to collectively as the "Subject Days Inn Locations."

41.    Jane Doe (A.A.M.)'s sexual exploitation repeatedly occurred in rooms of the Subject Days Inn Locations and was facilitated by the Wyndham Brand Defendants and Franchisee Defendants.

42.    Between January 2010 to December 2014, Jane Doe (A.A.M.) was trafficked an incalculable number of times at the Subject Days Inn Locations.

43.    Some of the obvious signs of Jane Doe (A.A.M.)'s trafficking at the Subject Days Inn Locations included the fact that hotel rooms would be paid for in cash or prepaid card, she would not leave the room, she had few or no personal items, the do not disturb sign was constantly on the door to the room being used, housekeeping was constantly refused, and there was constant heavy foot traffic in and out of her room involving men who were not hotel guests. These individuals entered and left at unusual hours and were present at the hotel for brief periods of time.

44.    The trafficker of Jane Doe (A.A.M.) and other sex traffickers frequently used Wyndham branded hotels for sex trafficking with approval, acquiescence, and/or implicit support of Defendants and their employees and agents, including the staff of the Subject Days Inn Locations.

## II.   The Hotel Industry's Role in Sex Trafficking and Defendants' Knowledge of the Problem.

45.   While the widely known and pervasive relationship between sex trafficking and the hotel industry necessarily shapes what Wyndham Defendants knew or should have known regarding the trafficking at their hotel properties, trafficking activity, including that of Jane Doe (A.A.M.), was pervasive and apparent at the locations at issue.

46.   Today, sex slavery is pervasive in the United States, and hotels are the primary place where it happens.[6] For years, sex traffickers have "been able to reap enormous profits with little risk when attempting to operate within hotels."[7] In 2014, 92 percent of calls to the Human Trafficking Hotline involved reports of sex trafficking taking place at hotels.[8] Hotels have been found to account for over 90 percent of commercial exploitation of children.[9]

47.   Because of this link between hotels and sex trafficking, government agencies and non-profits have devoted significant efforts to educating the hotel industry, including Defendants, on best practices for identifying and responding to sex trafficking.[10]

---

[6] "This is not only a dominant issue, it's an epidemic issue." *See* Jaclyn Galucci, *Human Trafficking is an Epidemic in the U.S. It's Also Big Business*, Fortune, April 2019, at https://fortune.com/2019/04/14/human-sex-trafficking-usslavery/ citing Cindy McCain, who chairs the McCain Institute's Human Trafficking Advisory Council. "It's also something that is hiding in plain sight. It's everywhere—it's absolutely everywhere." *Id*

[7] *See Human Trafficking in the Hotel Industry*, Polaris Project, February 10, 2016, at https://polarisproject.org/blog/2016/02/human-trafficking-in-the-hotel-industry/.

[8] Michele Sarkisian, *Adopting the Code: Human Trafficking and the Hospitality Industry*, CORNELL HOSPITALITY REPORT, 15(15), 3-10 (2015), available at: https://humantraffickingsearch.org/wp-content/uploads/2019/05/Adoptingthecode.report.cornell.pdf

[9] Erika R. George & Scarlet R. Smith, *In Good Company: How Corporate Social Responsibility Can Protect Rights and Aid Efforts to End Child Sex Trafficking in Modern Slavery*, 46 N.Y.U. J. INT'L L. & POL. 55, 92 (2013).

[10] *See, e.g.*, Department of Homeland Security, *Blue Campaign Toolkit*, available at: https://www.dhs.gov/sites/default/files/publications/blue-campaign/toolkits/hospitality-toolkit-eng.pdf; National Center for Missing & Exploited Children, *Child Sex Trafficking Overview*, available at: https://www.missingkids.org/content/dam/missingkids/pdfs/CST%20Identification%20Resource.pdf; Love 146, *Red Flags for Hotel and Motel Employees*, https://love146.org/wp-content/uploads/2017/04/Hospitality-Red-Flag-and-Reporting-Love146.pdf; Texas Attorney General, Human Trafficking Red Flags, available at: https://www2.texasattorneygeneral.gov/files/human_trafficking/human_trafficking_red_flags_handout.pdf .

48.     Multiple agencies and organizations who actively combat sex trafficking, including the United States Department of Homeland Security, the National Center for Missing and Exploited Children, the Polaris Project, the Texas Attorney General, Love 146, and EPCAT, among others, have established recommended policies and procedures for recognizing the signs of sex trafficking.[11]

49.     Some of the recommended policies and procedures intended to reduce or eliminate sex trafficking, which Defendants are aware or should be aware of, includelearning to identify warning signs and indicators of sex trafficking, including but not limited to:

    a.   Individuals show signs of fear, anxiety, tension, submission, and/or nervousness;

    b.   Individuals show signs of physical abuse, restraint, and/or confinement;

    c.   Individuals exhibit evidence of verbal threats, emotional abuse, and/or being treated in a demeaning way;

    d.   Individuals show signs of malnourishment, poor hygiene, fatigue, sleep deprivation, untreated illness, injuries, and/or unusual behavior;

    e.   Individuals lack freedom of movement or are constantly monitored;

    f.   Individuals avoid eye contact and interaction with others;

    g.   Individuals have no control over or possession of money or ID;

    h.   Individuals dress inappropriately for their age or have lower quality clothing compared to others in their party;

    i.   Individuals have few or no personal items—such as no luggage or other bags;

---

[11] United States Department of Homeland Security Blue Campaign – One Voice. One Mission. End Human Trafficking, https://www.dhs.gov/sites/default/files/publications/blue-campaign/toolkits/hospitality-toolkit-eng.pdf (last visited April 13, 2023);National Center for Missing and Exploited Children, https://www.missingkids.org/theissues/trafficking#riskfactors (last visited April 13, 2023); Love 146, *Red Flags for Hotel & Motel Employees*, https://love146.org/wp-content/uploads/2017/04/Hospitality-Red-Flag-and-Reporting-Love146.pdf (last visited April 13, 2023); Texas Attorney General, *Human Trafficking Red Flags*, https://www2.texasattorneygeneral.gov/files/human_trafficking/human_trafficking_red_flags_handout.pdf (last visited April 13, 2023).

j.   Individuals appear to be with a significantly older "boyfriend" or in the company of older males;

k.   A group of girls appears to be traveling with an older female or male;

l.   A group of males or females with identical tattoos in similar locations. This may indicate "branding" by a trafficker;

m.   Drug abuse or frequent use of "party drugs" such as GHB, Rohypnol, Ketamine, MDMA (Ecstasy), Methamphetamines, Cocaine, and Marijuana;

n.   Possession of bulk sexual paraphernalia such as condoms or lubricant;

o.   Possession or use of multiple cell phones; and

p.   Possession or use of large amounts of cash or pre-paid cards.[12]

50.   The signs of sex trafficking in a hotel environment follow well-established patterns and can easily be detected by appropriately trained staff. Tool kits specific to the hotel industry have been developed, which help hotel staff in every position identify and respond to signs of sex trafficking.[13] From check-in to check-out, there are indicators that traffickers and their victims routinely exhibit during their stay at a hotel.

51.   The relationship between a pimp and a prostitute is inherently coercive, and the United States Department of Justice and other agencies and organizations have recognized that most individuals involved in prostitution are subject to force, fraud, or coercion.[14] It is also well understood that "prostitution," "sex trafficking," and "child sex trafficking" involve a single common denominator, the exchange of sex for money.

---

[12] *Id.*

[13] Department of Homeland Security, *Blue Campaign Toolkit*, https://www.dhs.gov/sites/default/files/publications/blue-campaign/toolkits/hospitality-toolkit-eng.pdf.

[14] *See, e.g.*, *A National Overview of Prostitution and Sex Trafficking Demand Reduction Efforts, Final Report*, https://www.ojp.gov/pdffiles1/nij/grants/238796.pdf; *Prostitution and Trafficking in Women: An Intimate Relationship*, https://www.ojp.gov/ncjrs/virtual-library/abstracts/prostitution-and-trafficking-women-intimate-relationship.

52.     The definition of sex trafficking in the TVPRA under 18 U.S.C. §1591(a)(1) incorporates the definition of commercial sex act. Defendants understood the practical and legal association between commercial sex and sex trafficking in a hotel environment. Thus, Defendants knew or should have known that signs of commercial sex (prostitution) activity in their hotels were in fact signs of sex trafficking.[15]

53.     All Defendants were aware or should have been aware of these signs of sex trafficking when operating, controlling, and managing their hotel properties, when enacting and enforcing policies and procedures applicable to those hotels and when training, educating, and supervising the staff of that hotel.

54.     The most effective weapon against sexual exploitation and human trafficking is education and training.[16]  As ECPAT concluded:

> The hospitality industry is in a unique position to identify and report human trafficking due to its perceived anonymity. Traffickers believe they can go unnoticed while exploiting victims across the globe in hotels— ranging from budget properties to luxury resorts. From check-in to check-out, there are a number of indicators victims and exploiters exhibit during the time they are on a hotel property.[17]

55.     This same conclusion is echoed by others who seek to eliminate sex trafficking in the hospitality industry, including the American Hotel Lodging Association: "Hotel employees who have undergone training are more aware of trafficking when it happens – and are more willing to report it – than those who have not been trained.[18]  In reference to companies like the

---

[15] *Id.*

[16] Polaris, *Recognizing Human Trafficking*, https://polarisproject.org/recognizing-human-trafficking/ (last visited April 13, 2023).

[17] ECPAT USA, *Training for Hotel Associates*, https://www.ecpatusa.org/hotel-training (last visited April 13, 2023). *See also* Carolin L. et al., *Sex Trafficking in the Tourism Industry*, J. Tourism Hospit. (2015), https://www.longdom.org/open-access/sex-trafficking-in-the-tourism-industry-2167-0269-1000166.pdf.

[18] AHLA, *Free Online Training*, https://www.ahla.com/issues/human-trafficking (last visited April 13, 2023).

14

Defendants, ECPAT observed: "If they do nothing to raise awareness or to prevent child trafficking, they risk becoming an indirect and unintentional conduit for the abuse that takes place."

56. Given the prevalence of human trafficking in hotels and the abundance of information about how franchisors, owners, operators and hotel employees can identify and respond to this trafficking, it has become apparent that the decision of a hotel chain to continue generating revenue from traffickers without taking necessary steps to identify and prevent trafficking in its hotels is a conscious decision to financially benefit by supporting and facilitating unlawful sex trafficking.

57. Each of the Wyndham Defendants had a responsibility to adopt, implement, and adequately enforce policies to avoid facilitating sex trafficking and to train hotel staff to identify and respond to "red flags" of sex trafficking.

58. Unfortunately for Jane Doe (A.A.M.), the promises made by the Wyndham Defendants have proven empty. Defendants have failed, at all levels, to take appropriate action in response to their knowledge of widespread and ongoing human trafficking in their hotels. Instead, they have continued financially benefiting by providing venues for the sexual exploitation of victims like Jane Doe (A.A.M.).

## III. Sex Trafficking Has Long Been Prevalent at Wyndham Branded Properties, and Defendants Have Known About It.

59. Defendants' actual knowledge is *not* limited to a general awareness of the problem of sex trafficking in the hotel industry. Each of the Defendants has known, since well before Jane Doe (A.A.M.)'s trafficking, that sex trafficking was ongoing and widespread at Wyndham branded properties including the subject properties named herein.

### a. Sex Trafficking at Wyndham Branded Hotels was well Known by Defendants

60.    Use of Wyndham branded properties, including Days Inn properties, for sex trafficking is well known to Wyndham.

61.    Upon information and belief, at all relevant times Wyndham has adopted a centralized approach to trafficking-related issues at all its branded properties. Wyndham's public statements confirm that it knew sex trafficking was a problem at its hotels and that it retained control over the response of its branded hotels to sex trafficking. Wyndham has recognized it has a "critical role in increasing awareness and prevention" of sex trafficking in its hotels.[19] It has publicly claimed to be taking steps to avoid facilitating sex trafficking in its hotels since at least 2011.[20] However, Wyndham has refused to publish reports to show its progress on the EPCAT goals to combat sex trafficking in hotels.[21]

62.    Unfortunately, while Wyndham's statements reflect actual knowledge of the problem of sex trafficking, they reflect only a public relations strategy rather than a genuine commitment to stop facilitating trafficking. Emails among company executives reflect a hesitance to commit to meaningful anti-trafficking measures and a desire to avoid negative publicity without any significant burden.[22]

63.    The problem of sex trafficking at Wyndham branded properties was sufficiently well known that, in 2011, there was a public petition with thousands of signatures to stop Wyndham

---

[19] https://hotelsmag.com/news/wyndham-implements-anti-prostitution-training/

[20] https://hotelsmag.com/news/wyndham-implements-anti-prostitution-training/

[21] https://thecode.my.salesforce-sites.com/apex/MemberProfilenew?id=0019000000GxgPrAAJ&year=2023

[22] https://journalism.berkeley.edu/projects/should-hotel-chains-be-held-liable-for-human-trafficking/ ("Scott McLester, Wyndham's former general counsel and chief compliance officer, wrote in an e-mail to the company's then C.E.O., Stephen Holmes, 'Even though we have been hesitant to commit to everything the [EPCAT] Code was asking for, the issue is not going away and it's starting to impact commercial relationships.' McLester added that the organization's 'concern about being 'bullied' into signing the Code is outweighed by the relative harmlessness of the Code itself.'")

16

hotels from supporting child sex exploitation at Wyndham properties. Although the Wyndham brand publicly committed to take steps to stop facilitating trafficking, this promise proved empty; the Wyndham brand has been named a "major contributor to sexual exploitation" and part of the "dirty dozen list" by the National Center on Sexual Exploitation.[23]

64.     In the past twenty years, Wyndham-branded properties have been mentioned in at least two hundred criminal trafficking cases filed by the federal government.[24]

65.     Information that has become public through news stories establishes the entrenched and pervasive nature of the Wyndham Brand Defendants' role in providing a venue where sex trafficking has continued unabated for years. Upon information and belief, Wyndham monitored news stories and online reviews for indicia of criminal activity, including sex trafficking. Examples of news stories confirm the widespread presence of sex trafficking, prostitution, and related criminal activity at Wyndham branded hotels, including:

- In 2010, a California man was arrested for trafficking a 16-year-old victim after being spotted by law enforcement with the minor at a Days Inn in California.[25]

- In November 2011, a man was sentenced for sex trafficking after he forced minor girls to engage in commercial sex for his financial benefit, including at a Days Inn Motel in Virginia.[26]

- In January 2011, a man was sentenced to life for child sex trafficking for requiring a minor to perform commercial sex services more than 50 times over a 14-day period at a Florida Days Inn Motel.[27]

- In June 2011, an MS-13 gang member was indicted for trafficking girls at a Days Inn Motel near Washington, D.C.[28]

---

[23] https://endsexualexploitation.org/wyndham/
[24] https://journalism.berkeley.edu/projects/should-hotel-chains-be-held-liable-for-human-trafficking/
[25] https://www.wired.com/2010/11/epps/
[26] Gang member sentenced for sex trafficking in Prince William, News & Messenger (Manassas, Virginia) (November 4, 2011) https://plus.lexis.com/api/permalink/562d85d9-e662-4e4f-8f7f-67b52fa537e8/?context=1530671
[27] https://www.fbi.gov/jacksonville/press-releases/2011/ja011011.htm
[28] https://www.thepublicdiscourse.com/2011/10/4034/

- In 2012, four were indicted after forcing a 24-year-old woman to engage in commercial sex at Ohio hotels, including a Days Inn.[29] In December 2012, a man was arrested for attempting to entice a 15-year-old girl to engage in prostitution at a Days Inn Motel in Oklahoma.[30]

- In April 2013, two were arrested for trafficking a juvenile girl at an Illinois Days Inn.[31]

- In June 2013, a man was arrested on human trafficking charges after he forced a woman to engage in commercial sex at hotels, including a Louisiana Days Inn Motel.[32]

- A man was sentenced to 21 years in prison for sex trafficking his 16-year-old girlfriend starting in August 2013 at two hotels in Dallas, including a Days Inn Motel.[33]

- In 2013, a man was arrested at a Days Inn in Rhode Island and charged with trafficking a 17-year-old girl at the motel.[34]

- In September 2013, a Days Inn motel in Massachusetts was searched and a man was charged with sex trafficking of a 17-year-old developmentally disabled girl after staying with her at that hotel.[35]

- In November 2013, two pled guilty to sex trafficking charges after forcing a child to engage in commercial sex at Days Inn Motel in Texas.[36]

- In March 2014 a sex trafficking task force arrested four in a Portland area sweep of a Days Inn.[37]

---

[29] https://www.10tv.com/article/news/crime/crime-tracker/four-indicted-first-human-trafficking-case-franklin-county/530-36f713e6-5488-4465-90c0-7eb99504a635

[30] Man faces new sex-trafficking charges, Tulsa World (Oklahoma ) (March 9, 2013) https://plus.lexis.com/api/permalink/a9062a1a-76b4-4811-89ab-5b0b3c877a88/?context=1530671

[31] https://www.channel3000.com/news/local-news/2-women-accused-of-human-trafficking-at-motel/article_98edf1d4-d231-5ea1-a6b9-e71c83f44750.html

[32] https://www.endslaverytn.org/news/tenn-man-booked-in-human-trafficking-newsarticle

[33] https://www.ice.gov/news/releases/dallas-gang-member-sentenced-21-years-federal-prison-child-sex-trafficking-conviction

[34] https://turnto10.com/archive/new-details-in-ardrey-sex-trafficing-investigation

[35] https://www.providencejournal.com/story/news/crime/2013/09/14/20130914-missouri-man-charged-with-sex-trafficking-in-mass-teens-disappearance-ece/35397014007/

[36] https://www.chron.com/news/article/two-plead-guilty-to-child-sex-trafficking-5000132.php

[37] https://www.centralmaine.com/2014/03/03/sex_trafficking_task_force_arrests_4_in_portland_area_prostitution_sting/

- In June 2014, two were charged with trafficking a 13-year-old girl at a Minnesota Days Inn.[38]

- In November 2014, a man was charged in connection with a Lansing, MI based sex trafficking ring involving four 15- to 18-year-old girls who would meet customers at the Days Inn in Lansing.[39]

- In June 2015, a Texas man was arrested and charged with human trafficking and second degree kidnapping after a woman said she was forced to perform sexual acts and was being held against her will at a Baton Rouge Days Inn.[40]

- In August 2015 a LaGrange Kentucky Police Department's Special Investigation Unit discovered an alleged human trafficking and prostitution ring at a Days Inn motel involving a 16-year-old girl.[41]

- In October 2016, two men were charged with human trafficking-related offenses after officers responded to a Days Inn Motel in Frederick, Maryland.[42] One was later sentenced to 25 years in prison for second-degree rape and three counts of human trafficking.[43]

- In January 2017 a man faced human trafficking charges after a sting at a Days Inn in Harrisburg, PA.

- In March 2017 a man was accused of running a prostitution ring involving Alvin ISD minors out of a Lake Jackson, TX Days Inn.[44]

---

[38] https://www.grandforksherald.com/newsmd/moorhead-police-charge-two-with-sex-trafficking-13-year-old

[39] https://www.lansingstatejournal.com/story/news/local/2014/11/20/witnesses-face-lansing-man-charged-sex-trafficking-ring/70010754/

[40] https://www.wafb.com/story/29240032/texas-man-charged-with-human-trafficking-kidnapping-in-baton-rouge/

[41] https://www.lagrangenews.com/2015/10/03/alleged-human-trafficker-faces-charges/

[42] https://www.nbcwashington.com/news/local/two-charged-in-maryland-with-rape-human-trafficking-others/111815/

[43] https://www.fredericknewspost.com/news/crime_and_justice/courts/houston-man-sentenced-to-25-years-for-human-trafficking-in-frederick/article_81a5fa1e-598c-5431-b2f0-77dd49b1b545.html

[44] https://www.kgw.com/article/news/crime/man-accused-of-running-prostitution-ring-involving-alvin-isd-minors/285-424495364

19

- In June 2017 a sex trafficking operation was busted at a Days Inn in Lakeland, TN.[45]

- In October 2017 a Texas statewide sex trafficking ring shut down multiple hotels, including a Days Inn in Fort Worth.[46]

- In August 2018 authorities investigated a human trafficking case involving a 16 year old boy who was found at a Days Inn in Duson, LA.[47]

66.     These articles are only representative examples. There are many similar articles about sex trafficking and other associated criminal activity at Wyndham branded hotels. Moreover, on information and belief, the Wyndham Brand Defendants are aware of additional significant law enforcement activity related to trafficking at its hotels that was not reported in the media.

67.     Upon information and belief, each of the Wyndham Brand Defendants monitored criminal activity occurring at its branded hotels and were aware of activity indicating commercial sex trafficking or related crimes occurring at those branded hotels, including the specific property where (A.A.M.) was trafficked

68.     Reviews of Days Inn branded properties, which upon information and belief each of the Wyndham Brand Defendants, monitored regularly, also show both the pervasiveness of sex trafficking at its branded properties and the Wyndham Brand Defendants' knowledge of the same:

- An August 2008 review of a Days Inn property in Arizona stated: "Woke in middle of night (2:30am) with loud party on 2nd floor with bodies slamming into walls, and looked out window to see hooker and pimp making deal with another man in pickup in the parking lot."[48]

- A January 2010 review of a Days Inn property in Escondido, California stated: "This is a hooker hangout, doors slaming at 3:00 AM, You will hear pimps on their cellphones outside in the middle of the night. Ladies arriving at 4:00 AM,

---

[45] https://www.actionnews5.com/story/35657458/sex-trafficking-operation-busted-at-super-8-in-lakeland/
[46] https://tylerpaper.com/news/local/statewide-sex-trafficking-ring-shut-down-with-eight-arrests-including-some-tied-to-tyler/article_2db545e0-e48c-5c82-ace0-a7d27e746b96.html
[47] https://www.klfy.com/local/authorities-investigate-human-trafficking-case-involving-16-year-old-boy/
[48] https://www.tripadvisor.co/Hotel_Review-g60950-d74409-Reviews-Super_8_by_Wyndham_Tucson_Downtown_Convention_Center-Tucson_Arizona.html

Management MUST be aware this is going on and condone this. I expected John Walsh to show up with a film crew."[49]

- A February 2010 review of a Days Inn property in Los Angeles, California stated: "This place lacks security and there were drug dealers trying to push their products inside of the hotel. This place is Scary. The neighborhood was frightening and there were also prostitutes and homeless/addicts all over the place and renting rooms in the hotel. The desk guy looked at my friends attire (faux fur coat) and assumed he was a pimp and that we were prostitutes and seemed surprised that we had made reservations for more than one night. He kept giving us this strange smile... icky. This place left me with a bad feeling. If you want to stay here to save a few bucks my advice is to utilize the buddy system whenever you leave your room to visit the vending machines... after checking in for the night that is probably the only thing you will feel even moderately safe doing. eek. I can deal with scary hotels but this place is a disaster waiting to happen."[50]

- A June 2010 review of a Days Inn property in Virginia stated: "The location is in a very unsafe place. There were junkies and prostitutes using the premises of the hotel."[51]

- A July 2010 review of a Days Inn property in Texas stated: "After a night out parking lot full had to park under drive thur in front of hotel no other space. Number One reason to not stay here HOOKERS!!! walking the parking lot, walking the sidewalks and feeder road roads in front of Motel. All hours of the day."[52]

- An October 2011 review of a Days Inn property in Tennessee stated: "Don't stay here unless you want drugs or a prostitute....or both. There were drunks running up the halls all night and the maid offered to have sex with my husband for money. When he refused, she then offered to sell him pills."[53]

- A February 2012 review of a Days Inn property in Florida stated: "This hotel should not even be listed as a choice to stay in. Upon check, 3 rooms from me was a sexual battery crime scene. Prostitutes and drug deals were going on all over the property. The room was filthy, smelled horrible and I wouldn't even touch the bed! This hotel is a LIVE IN hotel for Prostitutes, drug dealers and gangs!!!!! DO NOT STAY HERE!!"[54]

---

[49] https://www.tripadvisor.com/Hotel_Review-g32358-d235407-i132418454-Super_8_Escondido-Escondido_California.html

[50] https://www.tripadvisor.com/Hotel_Review-g32655-d235134-Reviews-Super_8_by_Wyndham_Hollywood_La_Area-Los_Angeles_California.html

[51] https://www.expedia.com/Norfolk-Hotels-Super-8-By-Wyndham-NorfolkChesapeake-Bay.h7202.Hotel-Reviews

[52] https://www.tripadvisor.com/Hotel_Review-g30196-d109015-Reviews-Super_8_by_Wyndham_Austin_North_University_Area-Austin_Texas.html

[53] https://www.tripadvisor.com/Hotel_Review-g55138-d97967-Reviews-or165-Super_8_by_Wyndham_Knoxville_Downtown_Area-Knoxville_Tennessee.html

[54] https://www.tripadvisor.com/Hotel_Review-g34378-d113362-Reviews-Super_8_by_Wyndham_Lantana_West_Palm_Beach-Lantana_Florida.html

21

- An April 2012 review of a Days Inn property in Virginia stated: "Just beware, there are "escorts" who are constantly on the lookout for fresh meet. A pimp will knock on your door asking to use your cell to call his girlfriend. From then on, she will do the work."[55]

- An April 2012 review of a Days Inn property in Texas stated: "We have stayed in hotels all over the world and I have never had as terrible and frightening an experience as I had at this hotel. The place was crawling with prostitutes and seedy looking guys looking for prostitutes. We tried to stay here anyway, but the night manager started threatening us! In the end we had to call the police in order to safely leave. The police were very sympathetic, and apparently they have frequent problems with this hotel. Stay Away."[56]

- An October 2012 review of a Days Inn property in Florida stated: "the last time i stayed at this Days Inn, a hooker approached me in the parking lot and i informed you . this time there was a drug dealer in the next door room, cars coming and going all day & night a car would pull up and one person goes inside and 5 minutes later comes out. when i was checking out i told the desk clerk and the girl in the office says oh i know who that is. well if you knew about why was he still there. i will never stay there again, and i'm a loyal Days Inn customer."[57]

- A March 2013 review of a Days Inn property in Louisiana stated: "There was a PROSTITUTE running her business from a room, with her pimp standing outside. She propositioned a co-worker as he was going to his room. Then in the middle of the night she and her clients were fighting very loudly over money and services issued!"[58]

- A March 2013 review of a Days Inn property in Ohio stated: "I've been solicited for drugs and by prostitutes here on several occassions. I told the hotel staff about it and they seem to turn a blind eye to the problem because these people are also buying rooms."[59]

- A February 2013 review of a Days Inn property in Minnesota stated: "This hotel was disgusting. Homeless man passed out in lobby, possible prostitute hanging out in hallway with pimp, cigarette smell, ridiculous noise level throughout night, etc. Dirty shoes in microwave, empty beer cans in fridge. I cannot express enough how terrible this place really is."[60]

---

[55] https://www.expedia.com/Manassas-Hotels-Super-8-By-Wyndham-Manassas.h12141.Hotel-Reviews

[56] https://www.tripadvisor.ca/Hotel_Review-g56003-d240483-Reviews-Super_8_by_Wyndham_Houston_Brookhollow_NW-Houston_Texas.html

[57] https://www.tripadvisor.com/Hotel_Review-g34378-d113362-Reviews-Super_8_by_Wyndham_Lantana_West_Palm_Beach-Lantana_Florida.html

[58] https://www.tripadvisor.ca/Hotel_Review-g40314-d120851-Reviews-FairBridge_Inn_Express_Metairie-Metairie_Louisiana.html

[59] https://www.tripadvisor.com/Hotel_Review-g50891-d226034-Reviews-Quality_Inn_Columbus_East-Reynoldsburg_Ohio.html

[60] https://www.tripadvisor.com/Hotel_Review-g43493-d247863-Reviews-Super_8_by_Wyndham_St_Cloud-Saint_Cloud_Minnesota.html

- An April 2013 review of a Days Inn property in Georgia stated: "The hotel was filled with prostitutes and drug dealers and I was put in the back with my children which gave me no type of security. Days Inn needs to remove their name from this building."[61]

- A July 2013 review of a Days Inn property in California stated: "Our first night we were greeted by undercover police busting the prostitutes using the spare rooms to turn tricks. Maids make extra income unlocking vacant rooms. I would not recommend this place for children.Or anyone for that fact."[62]

- An August 2013 review of a Days Inn property in Ohio stated: "This hotel gives the Days Inn chain a bad reputation. The local restaurant management told us not to answer door due to prostitution issues."[63]

- An October 2013 review of a Days Inn property in Virginia stated: "We ended up wedging a pole in the door for safety reasons. After dark the place turned into, I do NOT exaggerate, a open hoer house. At lease 4 pimps were doing business with a dozen or so girls there. If not for the safety reasons it was a life experience seeing that side of society. We were surprised at a chain like Days Inn condoning this activity. . . . The big thing was the blatant open prostitution that was condoned by your chain was despicable. The car music blaring and loud laughing and yelling was just like out of a rap video. Shame on you Days Inn for condoning this kind of activity just to fill a room."[64]

- January 2014 review of a Days Inn in Lake Worth, FL states "Cops arresting drug dealers upon my arrival. Prostitutes. Very unsafe… Wasted money at Days Inn. Should have slept under a bridge instead!"[65]

- May 2014 review of a Days Inn in Houston, TX states "However, we have been staying here for a while on business and have noticed lots of young white women (who look and dress like prostitutes) with black men who appear to be their pimps and I've seen them using two rooms using one for "business". Staff should really be more aware of what's really going on here. Also, have smelled pot being smoked everyday and it just seems to be ignored by the staff as well."[66]

[61] https://www.tripadvisor.com/Hotel_Review-g34856-d217054-Reviews-Super_8_by_Wyndham_Atlanta_Hartsfield_Jackson_Airport-College_Park_Georgia.html

[62] https://www.tripadvisor.com/Hotel_Review-g32655-d252254-Reviews-or50-Super_8_by_Wyndham_Canoga_Park-Los_Angeles_California.html

[63] https://www.tripadvisor.com/Hotel_Review-g50891-d226034-Reviews-Quality_Inn_Columbus_East-Reynoldsburg_Ohio.html

[64] https://www.tripadvisor.com/Hotel_Review-g58026-d110776-Reviews-or10-Super_8_by_Wyndham_Norfolk_Chesapeake_Bay-Norfolk_Virginia.html

[65] https://www.expedia.com/Lantana-Hotels-Super-8-By-Wyndham-Lantana-West-Palm-Beach.h855762.Hotel-Reviews

[66] https://www.tripadvisor.com/Hotel_Review-g56003-d2531544-Reviews-Super_8_by_Wyndham_Houston_North_I_45-Houston_Texas.html

- June 2014 review of a Days Inn in Austin, TX states "What can I say? The rooms are small, the furniture tore up, refrigerator not cold, sink and tub would back up with water, carpet sticky, lights with no lampshades, and hookers and pimps running around with the management's blessing."[67]

- July 2014 review of a Days Inn in Norfolk, VA states "This place is in a cheaper end of town and the other guests looked like drunks and hookers hanging out in folding chairs on the balcony. Police were in the parking lot when we arrived."[68] Hotel management responded to this review on July 29, 2014.

- October 2014 review of a Days Inn in Denver, CO states "The cleaning of the place was awful, prostitutes knocking on doors touting for business, the only reason i ended up staying there longer than a night was there was nowhere else. Will never go back again."[69]

- December 2014 review of a Days Inn in Augusta, GA states "My room was right beside permanent residents. Had a prostitute come in my room while i was trying to load luggage in my vehicle...NEVER again will I stay here!"[70]

- February 2015 review of a Days Inn in Pompano Beach, FL states "I thought of something positive, you won't have to go looking for a hooker... they are already staying there."[71]

- March 2015 review of a Days Inn in Houston, TX states "Awfull. Drug dealers and prostitutes everywhere. Hotel staff just let it happen. Saw one of them with a crack pipe. I couldn't stay. Didn't even stick around long enough to check in. I called the police to report what I saw going on. Bad bad bad. Stay away from tjis one."[72]

- April 2015 review of a Days Inn in Sacramento, CA states "Rooms were clean, but the smell of weed filled the hallways. Shady characters and possible prostitution activity were common throughout our stay. our Van door lock was broken, luckily we had nothing valuable inside. The front desk was friendly and courteous. I knew

[67] https://www.tripadvisor.com/Hotel_Review-g30196-d142017-Reviews-Super_8_by_Wyndham_Austin_University_Downtown_Area-Austin_Texas.html
[68] https://www.tripadvisor.com/Hotel_Review-g58026-d110776-Reviews-or10-Super_8_by_Wyndham_Norfolk_Chesapeake_Bay-Norfolk_Virginia.html
[69] https://www.tripadvisor.ca/Hotel_Review-g33388-d82976-Reviews-Super_8_by_Wyndham_Denver_Stapleton-Denver_Colorado.html
[70] https://www.expedia.com/Augusta-Hotels-Super-8-By-Wyndham-Augusta.h10194.Hotel-Reviews
[71] https://www.expedia.com/Fort-Lauderdale-Hotels-Super-8-By-Wyndham-Pompano-Beach.h856303.Hotel-Reviews
[72] https://www.expedia.com/Houston-Hotels-Super-8-By-Wyndham-HoustonDtwnI-610.h892798.Hotel-Reviews

somethng was up when an armed security guard was present during check in."[73] Management responded to this review on April 12, 2015.

- May 2015 review of a Days Inn in Colarado Springs, CO states "I'm not sure if it was the blood in the shower or the homeless man camped out in the stairwell that caps the awfulness of this place but maybe it was the prostitute's post-coital walk of shame on our last night that did it. Either way, this stay - without hyperbole - was the worst paid-lodging stay I've had in at least a decade…"[74]

- July 2015 review of a Days Inn in Raleigh, NC states "The two nights we were there were almost frightening. There were prostitutes visting guests, they were couples having fist fights both nights. Some man was on the property in broad daylight screaming all kinds of profanity. There was homeless guy hanging out in the parking lot and pretty sure he helped himself to coffee int he lobby and nobody said anything. I called and complained twice about the man screaming and the guys skating boarding on the walkway at 4:30 a.m. outside our door. The have no control over their property and will never stay there again!"[75]

- September 2015 review of a Days Inn in Austin, TX states "I was propositioned twice by hookers who had rooms in the building and saw two drug deals go down in the parking lot. There are people going through the parking lot and picking up the dealer and then drop him off in a couple of minutes. The girls are also hanging outside and when a car pulls up they get in with the guy. They return in a few minutes and drop her off. The guys never get out."[76]

- December 2015 review of Days Inn in Fort Myers, FL states "This hotel is not in a good area nor is it a good place to stay. there were drugs being sold in the hotel parking lot and prostitutes were all around the hotel. Not a safe place to stay."[77]

- April 2016 review of a Days Inn in Austin, TX states "I'm going to be more blunt here than other reviewers. This is a whore house they even rent rooms by the hour, I found this out when attempting to do early check in and they have me the hourly rates. The bathroom is filthy, aged and poor quality simply painted cement with cracks and scratches. It is in a rough neighborhood so watch out for your car. Drugs and prostitutes. I even saw two guys lingering in line outside a room waiting for their turn. Lastly I was awoken at 6:15am by a man who was yelling at and, from

[73] https://www.tripadvisor.com/Hotel_Review-g32999-d969149-Reviews-Super_8_by_Wyndham_Sacramento-Sacramento_California.html
[74] https://www.yelp.com/biz/super-8-by-wyndham-colo-sprs-garden-of-the-gods-colorado-springs
[75] https://www.tripadvisor.com/Hotel_Review-g49463-d94688-Reviews-Super_8_by_Wyndham_Raleigh-Raleigh_North_Carolina.html
[76] https://www.tripadvisor.com/Hotel_Review-g30196-d142017-Reviews-Super_8_by_Wyndham_Austin_University_Downtown_Area-Austin_Texas.html
[77] https://www.expedia.com/Fort-Myers-Hotels-Super-8-By-Wyndham-Fort-Myers.h49549.Hotel-Reviews

the sounds of it, beating a dog. The female occupant of the room was begging him to stop which resulted in a slap."[78]

- August 2016 review of a Days Inn in North Hollywood, CA states "There was prostitution going on. Overall service suck, not worth at all the $140 that I paid."[79]

- February 2017 review of a Days Inn in New Orleans, LA states "Location was terrible which made Uber rides a fortune. What they don't tell you is that it's located in the 8th ward and full of prostitution and drugs."[80] Hotel management responded to this review on March 8, 2017.

- May 2017 review of a Days Inn in Minneapolis, MN states "Pictures are nothing like the hotel. Prostitutes, drugs, a building and parking lot full of very unsavory people is what you will get."[81]

- August 2017 review of a Days Inn in Lake Worth, FL states "If you can afford to stay someplace else then do it!!! Please do not bring your children here. Drugs, prostitution, police every day, ambulances in and out for overdoses. It's cheap for a reason people."[82] Hotel management responded to this review.

- November 2017 review of a Days Inn in Los Angeles, CA states "This place is disgusting, it smelled like urine in most of the hotel including our room and there were men coming in and out through the stairway. I think there might have been prostitution going on Wyndham should be ashamed at this property is part of their chain."[83] Hotel management responded to this review on November 27, 2017.

- April 2018 review of a Days Inn in Columbia, SC states "This place was horrible!! The clerk was hanging out with I guess extended stay guests in the front parking lot when we arrived. Two girls that looked like prostitutes were hanging around. Not such a safe looking place."[84] Hotel management responded to this review on April 25, 2018.

---

[78] https://www.yelp.com/biz/super-8-by-wyndham-austin-university-downtown-area-austin

[79] https://www.expedia.com/Los-Angeles-Hotels-Super-8-By-Wyndham-North-Hollywood.h916715.Hotel-Reviews

[80] https://www.tripadvisor.com/Hotel_Review-g60864-d120826-Reviews-Super_8_by_Wyndham_New_Orleans-New_Orleans_Louisiana.html

[81] https://www.expedia.com/Minneapolis-St-Paul-Hotels-Super-8-By-Wyndham-Brooklyn-CenterMPLS.h124015.Hotel-Reviews

[82] https://www.expedia.com/Lantana-Hotels-Super-8-By-Wyndham-Lantana-West-Palm-Beach.h855762.Hotel-Reviews

[83] https://www.tripadvisor.com/Hotel_Review-g32655-d235134-Reviews-Super_8_by_Wyndham_Hollywood_La_Area-Los_Angeles_California.html

[84] https://www.tripadvisor.com/Hotel_Review-g54184-d226843-Reviews-Super_8_by_Wyndham_Columbia-Columbia_South_Carolina.html

- July 2018 review of a Days Inn in Garland, TX states "Dont stay here unless you have ltc... there is drugs prostitution and all they do not clean nothing and the pool sucked I had condoms in the night stand... I would never put the Wyndham name on this crap hole hotel."[85] Hotel management responded to this review on July 17, 2018.

- September 2018 review of a Days Inn in Austin, TX states "Then we went to the room where we met a prostitute at the stairs. Went into our room which smelled very badly of mold. The air ventilation was terrible - way below standard. We went to bed, had trouble sleeping because we felt unsafe and uncomfortable. The night was full of noice with the sex activities, cars arriving and leaving, yelling and screaming in the parking lot and doors were slamming."[86]

69.    These reviews are examples. There are many similar online reviews for Days Inn branded hotels, and, on information and belief, there are additional similar reviews and other customer complaints from before 2012 that are not currently available on the internet but which the Wyndham Brand Defendants know about.

70.    These and other news stories, guest surveys, and online reviews show that the use of Wyndham and Days Inn hotels for sex trafficking was not isolated to one hotel property or a single geographic area. The common use of Wyndham and Days Inn hotels for sex trafficking became a nationwide problem that stemmed from decisions made at the corporate/franchisor level.

71.    Each Defendant knew of the sex trafficking crisis prevalent in the hotel industry generally, as well as specifically at Days Inn branded hotels, including the subject hotel, and while Defendants claim not to tolerate such activity, the evidence shows and will show at trial that sex trafficking continued at the Subject Days Inn Locations frequently and long after the trafficking of the Plaintiff.

---

[85] https://www.tripadvisor.com/Hotel_Review-g55884-d241642-Reviews-Super_8_by_Wyndham_Garland_North_Dallas_Area-Garland_Texas.html
[86] https://www.tripadvisor.com/Hotel_Review-g30196-d142017-Reviews-Super_8_by_Wyndham_Austin_University_Downtown_Area-Austin_Texas.html

72.     This sampling of news stories, reviews, and other public information establishes that, at the time Jane Doe (A.A.M.) was trafficked at the subject properties, Wyndham knew or should have known that:

a.  The use of its branded properties for sex trafficking was not limited to one location or geographic region but was a widespread problem;

b.  Commercial sex work occurring at its branded properties involved trafficking and compelled prostitution;

c.  Their franchisees and hotel staff were not taking reasonable steps to deter, detect, and disrupt known or probable sex trafficking occurring at its hotel properties;

d.  Their efforts, if any, to stop facilitating sex trafficking in Wyndham branded properties were not effective; and

e.  They were, by their acts and omissions, facilitating sex trafficking at Wyndham branded properties by providing venues where that trafficking was occurring widely and without sufficient detection or deterrence.

73.     Despite the mounting evidence that sex trafficking at its properties was ongoing and growing, Wyndham chose to earn revenue by continuing conduct that they knew or should have known would facilitate that trafficking**b.**

**b. Defendants had actual and constructive knowledge of widespread and ongoing sex trafficking at the subject Wyndham locations.**

74.     Sex trafficking was widespread and pervasive at the Subject Days Inn Locations specifically.

75.     The Wyndham Brand Defendants and Franchisee Defendants knew or should have known about the sex trafficking pervasive at the Subject Days Inn Locations based on obvious indicators of this activity.

76.     Internet reviews for the subject Subject Days Inn Locations, which upon information and belief the Wyndham and Franchisee Defendants manage and monitor, show the

28

pervasiveness of sex trafficking before and well after Jane Doe (A.A.M.) was trafficked. For example:

- A 2013 TripAdvisor review for the Houston St Days Inn states: "…When we got into the room the first thing we noticed was the hideous smell and dirty, unvaccumed carpet. Then we were introduced to drug bags and syringes on the floor! One of the pillows had blood on it which they tried to cover up with a dirty pillow case!..."[87]

- A 2013 TripAdvisor review for the Houston St Days Inn states: "This hotel was terrible. I wouldn't reccommend this digusting place to anyone. The comforters and so call sheets looked nasty. There wasn't even a fitted sheet on the bed. The A/C was on the floor. The refrigerator was nasty with sticky stuff and hair. Drug addicts walking around…"[88]

- A 2013 TripAdvisor review for the Houston St Days Inn states: "we were put in a room that had dirty white stuff all over floor, dirty clothes on the floor. Note in the drawer " For drugs call ****and gave the number. The bed was broke in half. Naked girls throwing under garments off the top floor. Guest smoking crack all night smell overwhelmed the room with my kids!!!!..."[89]

- A 2016 Expedia review for the Houston St Days Inn states: "This was the most disgusting hotel I've ever stayed at. There were people outside doing drug deals all night, my bed had hair all over it, my sheets and towels were filthy…"[90]

- A 2018 Google review for the Houston St Days Inn states: "Sketchy. we all had to leave because we had a broken lock and prostitution was common here. DO NOT SPEND ANY NIGHT HERE."[91]

---

[87] https://www.tripadvisor.com/Hotel_Review-g60956-d108190-ReviewsKnights_Inn_San_Antonio_near_AT_T_Center-San_Antonio_Texas.html

[88] https://www.tripadvisor.com/Hotel_Review-g60956-d108190-Reviews-Knights_Inn_San_Antonio_near_AT_T_Center-San_Antonio_Texas.html

[89] https://www.tripadvisor.com/Hotel_Review-g60956-d108190-Reviews-Knights_Inn_San_Antonio_near_AT_T_Center-San_Antonio_Texas.html

[90] https://www.expedia.com/San-Antonio-Hotels-Knights-Inn-San-Antonio-Near-ATT-Center.h6210.Hotel-Reviews

[91] https://www.google.com/travel/hotels/Knights%20Inn%204039%20E%20Houston%20St,%20San%20Antonio,%20TX%2078220%20google/entity/CgsIdnymu3S85_JARAB/prices?g2lb=2502548,2503771,2503781,2504112,4258168,4270442,4284970,4291517,4306835,4429192,4515404,4597339,4723331,4731329,4757164,4778035,4814050,4821091,4861688,4864715,4874190,4886082,4886480,4893075,4902277,4905351,4905600,4906023,4926165,4926489,4930751,4930752,4931360,4935107,4936396,4937897,47061553&hl=enUS&gl=us&ssta=1&q=Knights+Inn+4039+E+Houston+St,+San+Antonio,+TX+78220+google&grf=EmQKLAgOEigSJnIkKiIKBwjnDxADGAESBwjnDxADGAIgADAeQMoCSgcI5w8QARgfCjQIDBIwEi6yASsSKQonCiUweDg2NWNmNjlmNDYyYzU0OTU6MHhjOTNmY2U5NmQzNWNhY2Y5&rp=EPnZ8prt0vOfyQEQ-dnymu3S85_JATgCQABIAcABAg&ictx=1

29

- A 2017 Expedia review for the Houston St Days Inn states: "To much drugs in the rooms around my room." [92]

- A 2019 Expedia review for the Houston St Days Inn states: "Not a very comfortable place saw condoms on parking lot beds were uncomfortable not very pleasant people on front desk for customer services."[93]

- A 2019 Google review for the Houston St Days Inn states: "Filthy. Dirty sheets on bed. I didn't stay. Will not refund my money. Junkies doing drugs in plain sight. Prostitutes fighting outside. Feces on both beds. People sleeping on floor outside the rooms. Wyndham associate."[94]

- A 2021 Booking eview for the Houston St Days Inn states: "Positive: Nothing|Negative: Drugs were being sold out of the room below us. Prostitution was happening and was offered to my boyfriend. The bed in the first room was broken so we requested a second room. In the second room it broke when we laid down and the coffee pot was broke as well. There were 2 holes in wall. And, the top lock on the door was broken. We had to pay a security deposit in addition to the room fee in case we damaged the room but on booking.com we weren'€™t informed of this."[95]

- A 2012 TripAdvisor review for the I-10 Days Inn states: "…As a few of the other reviews mentioned there are hookers and drug dealers everywhehere…"[96]

- A 2012 TripAdvisor review for the I-10 Days Inn states: "…Our first night was not bad, we did notice alot of traffic in and out. The second night the hotel rep on duty was kicking hookers (yes hookers) out of the hotel. As we walked to the car we were approached by a man who was from the Econo lodge in the same parking lot. It turns out he was the pimp of thehookers and was tryingto get my husband to go use them! He them asked alot of questions like if we were

---

[92] https://www.expedia.com/San-Antonio-Hotels-Knights-Inn-San-Antonio-Near-ATT-Center.h6210.Hotel-Reviews
[93] https://www.expedia.com/San-Antonio-Hotels-Knights-Inn-San-Antonio-Near-ATT-Center.h6210.Hotel-Reviews
[94]https://www.google.com/travel/hotels/Knights%20Inn%204039%20E%20Houston%20St,%20San%20Antonio,%20TX%2078220%20google/entity/CgsIdnymu3S85_JARAB/prices?g2lb=2502548,2503771,2503781,2504112,4258168,4270442,4284970,4291517,4306835,4429192,4515404,4597339,4723331,4731329,4757164,4778035,4814050,4821091,4861688,4864715,4874190,4886082,4886480,4893075,4902277,4905351,4905600,4906023,4926165,4926489,4930751,4930752,4931360,4935107,4936396,4937897,47061553&hl=enUS&gl=us&ssta=1&q=Knights+Inn+4039+E+Houston+St,+San+Antonio,+TX+78220+google&grf=EmQKLAgigSJnIkKiIKBwjnDxADGAESBwjnDxADGAIgADAeQMoCSgcI5w8QARgfCjQIDBIwEi6yASsSKQonCiUweDg2NWNmNjlmNDYyYzU0OTU6MHhjOTNmY2U5NmQzNWNhY2Y5&rp=EPnZ8prt0vOfyQEQ-dnymu3S85_JATgCQABIAcABAg&ictx=1
[95] https://www.booking.com/hotel/us/knights-inn-san-antonio-near-a-t-and-t-center.html
[96] https://www.tripadvisor.com/Hotel_Review-g60956-d99497-zft1-Days_Inn_by_Wyndham_Central_San_Antonio_NW_Medical_Center.html

30

going out for the night, what kind of radio was in our car etc. We did not feel safe. Will not stay here again even if price is lower."[97]

- A 2014 Tripadvisor review for the I-10 Days Inn states: "…On on my lil sisters room she found a used condom!!! YUK…"[98]

- A 2015 Yelp review for the I-10 Days Inn states: "Never again, this place didn't deserve any stars but I had to pick 1. I was actually scared to sleep here, very old, very run down, place is falling apart, BED BUGS, snoopy residents, it looks like a lot of people stay here regularly to sell drugs or prostitution. We were out of there at the crack of dawn!! I would not recommend this place to anyone SAVE YOUR MONEY!!!!!!!!!!!!"[99]

- A 2017 Google review for the I-10 Days Inn states: "Not so bad. Clean rooms, but small restrooms. If you can stay somewhere else if you have children. There is a lot of homeless people around the hotel. Hookers and drug dealers as well. A bit scary to go out of your room at night. Breakfast was not so great either."[100]

- A 2021 Booking review for the I-10 Days Inn states: "Positive: Staff was very friendly and understsnding|Negative: The location. The drug dealing and prostitution"[101]

- A 2022 Booking review for the I-10 Days Inn states: "Positive: Nothing, I'll never use this place again prostitution, drug deals, awful parking, roaches and staff was rude!|Negative: Roaches, rude staff, no parking, prostitutes in parking lot. Drug deals in parking lot HORRIBLE."[102]

77. Traffickers, including Jane Doe (A.A.M.)'s trafficker, repeatedly chose to use these subject Wyndham locations for their sex trafficking activity. As such, Wyndham Defendants also

---

[97] https://www.tripadvisor.com/Hotel_Review-g60956-d99497-zft1-Days_Inn_by_Wyndham_Central_San_Antonio_NW_Medical_Center.html

[98] https://www.tripadvisor.com/Hotel_Review-g60956-d99497-zft1-Days_Inn_by_Wyndham_Central_San_Antonio_NW_Medical_Center.html

[99] https://www.yelp.com/biz/days-inn-n-w-medical-center-san-antonio

[100] https://www.google.com/travel/hotels/Days%20Inn%206023%20I10%20W,%20San%20Antonio,%20TX%2078213%20google/entity/CgsIs5uCw5fV79m3ARAB/reviews?g2lb=2502548,2503771,2503781,4258168,4270442,4284970,4291517,4306835,4429192,4515404,4597339,4723331,4731329,4757164,4778035,4814050,4821091,4861688,4864715,4874190,4886082,4886480,4893075,4902277,4905351,4905599,4906023,4926165,4926489,4930751,4930752,4931360,4934342,4936396,4937897,4937954,4941047,4942346,47061553&hl=enIN&gl=in&ssta=1&q=Days+Inn+6023+I10+W,+San+Antonio,+TX+78213+google&grf=EmQKLAgOEigSJnIkKiIKBwjnDxACGAUSBwjnDxACGAYgADAeQMoCSgcI5w8QARgfCjQIDBIwEi6yASsSKQonCiUweDg2NWM1ZTRlZDcwYTRiMmY6MHhiN2IzYmVhOTc4NjA4ZGIz&rp=ELObgsOX1e_ZtwEQs5uCw5fV79m3ATgCQABIAcABAg&ictx=1&sa=X&ved=2ahUKEwjW0casz_H8AhXAATQIHaYCCZIQv_QBegQIVhAc

[101] https://www.booking.com/hotel/us/nw-medical-center-san-antonio-texas.html

[102] https://www.booking.com/hotel/us/nw-medical-center-san-antonio-texas.html

31

knew or should have known about the pervasive sex trafficking at the Wyndham locations based on obvious indicators of this activity.

78.    Upon information and belief and based on hotel reviews and records of law-enforcement calls, there were multiple trafficking victims exploited at the subject Wyndham locations named herein prior to Jane Doe (A.A.M.)'s trafficking who exhibited "red flags" of trafficking that were observed by hotel staff and management, including paying with cash or prepaid cards, having high volumes of men who not registered guests in and out of their room at unusual times, arriving with few possessions for extended stays, and other signs consistent with the "red flags" of trafficking identified above. Trafficking has a significant effect on its victims, and, upon information and belief, there were obvious "red flags" of trafficking apparent from the appearance, demeanor, and restricted movements of these victims, as well as the nature of these victims' interactions with their traffickers and others, all of which provided notice that these victims were being subject to violence, coercion, control, and exploitation.

79.    All knowledge from the staff at these subject Wyndham locations is imputed to Wyndham Defendants. Wyndham Defendants knew about this widespread and ongoing trafficking at these Wyndham locations, including the trafficking of Jane Doe (A.A.M.), through the direct observations of hotel staff, including management-level staff.

80.    Defendants knew that a population of traffickers, including Jane Doe (A.A.M.)'s trafficker, repeatedly chose to use the Subject Days Inn Locations for their sex trafficking activity. They selected these hotels because of policies and practices that created a favorable environment for trafficking and because hotel staff turned a blind eye to signs of trafficking. These traffickers followed a repetitive and routine procedure during stays at the Subject Days Inn Locations. There were obvious signs of this activity, which were consistent with the well-known "red flags" for sex

trafficking in the hospitality industry. As such, Defendants also knew or should have known about the pervasive sex trafficking at the Subject Days Inn Locations based on obvious indicators of this activity.

81.    This population of traffickers, including (A.A.M.)'s trafficker, operated with little regard for concealment, due to an implicit understanding between Defendants and the traffickers. This understanding enabled the traffickers to operate openly, as they had found a venue where they could conduct their operations without disruption from Defendants.

82.    Upon information and belief, there were other victims being trafficked at the Subject Days Inn Locations at the same time as (A.A.M.), and there were obvious signs these victims were being trafficked.

83.    Based upon information and belief, the conduct of Defendants facilitated the trafficking of a number of victims by a population of multiple traffickers at the Subject Days Inn Locations. Defendants developed a continuous business relationship with this population of traffickers who operated at the hotel on a routine and repetitive basis.

84.    Upon information and belief and based on hotel reviews and records of law-enforcement calls, there were multiple trafficking victims exploited at the Subject Days Inn Locations prior to Jane Doe (A.A.M.)'s trafficking who exhibited "red flags" of trafficking that were observed by hotel staff and management, including paying with cash or prepaid cards, having high volumes of men who not registered guests in and out of their room at unusual times, arriving with few possessions for extended stays, and other signs consistent with the "red flags" of trafficking identified above. Trafficking has a significant effect on its victims, and, upon information and belief, there were obvious "red flags" of trafficking apparent from the appearance, demeanor, and restricted movements of these victims, as well as the nature of these victims'

interactions with their traffickers and others, all of which provided notice that these victims were being subject to violence, coercion, control, and exploitation.

85.    All knowledge from the staff at the Subject Days Inn Locations is imputed to Franchisees, which employed the hotel staff. Thus, Franchisees knew about the widespread and ongoing trafficking at the Subject Days Inn Locations, including the trafficking of Jane Doe (A.A.M.), through the direct observations of hotel staff, including management-level staff. This knowledge is further imputed to the Wyndham Brand Defendants based on the existence of an actual agency relationship as described below.

86.    Upon information and belief, in addition to available public sources of information about trafficking and knowledge imputed from the hotel staff and management, both the Wyndham Brand Defendants and Franchisees learned or should have learned about the obvious signs of widespread trafficking at the Subject Days Inn Locations, based on non-public sources of information including but not limited to:

      a.   surveillance of the property;

      b.   internal investigations;

      c.   customer complaints;

      d.   monitoring of customer feedback;

      e.   information received from law enforcement;

      f.   and other sources of non-public information available to Franchisee.

87.    Upon information and belief, the Wyndham Defendants knew or should have known about the widespread trafficking at the subject Wyndham locations referenced herein, based on:

      a.   The obligation of hotel staff and hotel management to report suspected criminal activity including sex trafficking to the Wyndham Defendants;

b. The Defendants' regular monitoring of online reviews;

c. The Defendants' collection and monitoring of customer surveys and complaints;

d. The Defendants' regular inspections of the hotel property;

e. Information provided to Defendants by law enforcement; and

f. Other sources of information available to Defendants.

88. Upon information and belief, under the Wyndham Brand Defendants' protocols, which on their face required hotel staff and franchisee to report suspected criminal activity to the Wyndham Brand Defendants, hotel staff and management were required to report and did report numerous instances of suspected sex trafficking to the Wyndham Brand Defendants prior to (A.A.M.)'s trafficking based on the numerous "red flags" exhibited by the victims who were exploited at the Subject Days Inn Locations.

89. Upon information and belief, the Wyndham Brand Defendants observed obvious "red flags" of numerous instances of sex trafficking occurring at the Subject Days Inn Locations based on their supervision and monitoring of the property.

**c. Defendants knew Jane Doe (A.A.M.) was being trafficked at these subject Wyndham locations because of the apparent and obvious "red flags" of sex trafficking.**

90. During the period that Jane Doe (A.A.M.) was trafficked at the Houston St Days Inn, there were obvious signs that her traffickers were engaged in sex trafficking:

a. The hotel rooms in which she was trafficked were frequently paid for with cash or prepaid cards;

b. Other girls were trafficked at the same hotel at the same time as Jane Doe (A.A.M.);

c. Even though Jane Doe (A.A.M.) and her trafficker would stay for multiple days or weeks at a time, housekeeping was kept away by using the "Do Not Disturb" door hanger;

d. Housekeeping staff was prevented from entering the room for regular cleaning, towel exchange and other standard room services;

35

e.  The trafficker were often present with Jane Doe (A.A.M.) at check in and would linger around the hotel or in the parking lot while she was with a john;

f.  Jane Doe (A.A.M.) requested the same rooms in the back of the property;

g.  Hotel management and/or employees warned Jane Doe (A.A.M.) that she was being watched by the authorities;

h.  There was heavy foot traffic in and out of Jane Doe (A.A.M.)'s room involving men who were not hotel guests;

i.  Jane Doe (A.A.M.) had at least ten (5) johns every day. These individuals entered and left at unusual hours and were present at the hotel for brief periods of time; and

j.  Other obvious signs of trafficking consistent with the modus operandi of her traffickers and which included well known "red flags" for trafficking in a hotel.

91.  During the period that Jane Doe (A.A.M.) was trafficked at the I-10 Days Inn, there were obvious signs that her traffickers were engaged in sex trafficking:

k.  The hotel rooms in which she was trafficked were frequently paid for with cash or prepaid cards;

l.  Other girls were trafficked at the same hotel at the same time as Jane Doe (A.A.M.);

m.  Even though Jane Doe (A.A.M.) and her trafficker would stay for multiple days or weeks at a time, housekeeping was kept away by using the "Do Not Disturb" door hanger;

n.  Housekeeping staff was prevented from entering the room for regular cleaning, towel exchange and other standard room services;

o.  The trafficker were often present with Jane Doe (A.A.M.) at check in and would linger around the hotel or in the parking lot while she was with a john;

p.  Hotel management and/or staff always put Jane Doe (A.A.M.) in rooms at the back of the property;

q.  A maintenance staff member advised Jane Doe (A.A.M.) to be careful because she was being watched by the authorities;

r.  There was heavy foot traffic in and out of Jane Doe (A.A.M.)'s room involving men who were not hotel guests;

s.  Jane Doe (A.A.M.) had at least ten (5) johns every day. These individuals entered and left at unusual hours and were present at the hotel for brief periods of time; and

36

92.    Other obvious signs of trafficking consistent with the modus operandi of her traffickers and which included well known "red flags" for trafficking in a hotel

93.    Based upon information and belief, multiple employees at the subject Wyndham locations named herein, including management-level employees, observed, or were made aware of these obvious signs of trafficking while acting within the scope and course of their employment.

94.    As such, Wyndham Defendants and Franchisee Defendants knew or were willfully blind to the fact that Jane Doe (A.A.M.) was being trafficked at the subject Wyndham properties.

95.    The Wyndham Defendants and Franchisees had constructive knowledge of the trafficking of (A.A.M.) at the Subject Days Inn Locations because that trafficking was the direct result of the Wyndham Defendants and Franchisees facilitating trafficking at the Subject Days Inn Locations.

96.    Based on their knowledge of the problem of sex trafficking in the hotel industry, at Wyndham branded hotels, and at the Subject Days Inn Locations, Wyndham Defendants and Franchisees each had a duty to exercise reasonable prudence to detect ongoing sex trafficking at the Subject Days Inn Locations and to make a reasonable investigation in response to signs of potential sex trafficking. If the Defendants had used reasonable prudence, they would have been aware of Jane Doe (A.A.M.)'s trafficking at the Subject Days Inn Locations and that they were benefiting from such trafficking.

IV.    **Defendants actively facilitated sex trafficking at these subject Wyndham locations, including the trafficking of Jane Doe (A.A.M.).**

97.    Wyndham Defendants had both actual and constructive knowledge of the trafficking of Jane Doe (A.A.M.) at these Wyndham locations because the trafficking was the direct result of Wyndham Defendants facilitating her trafficking at the Wyndham locations.

37

a.  **AMBM Investment Company, LLC d/b/a Days Inn facilitated the trafficking of Jane Doe (A.A.M.).**

98.    AMBM Investment Company, LLC is responsible for the acts, omissions, and knowledge of all employees of the Houston St Days Inn when operating the hotel because these acts and omissions were committed in the course and scope of employment, because AMBM Investment Company, LLC ratified these acts and omissions, and because AMBM Investment Company, LLC failed to exercise reasonable care with regard to the hiring, training, and supervision of these employees given the specific risks, known to AMBM Investment Company, LLC, of sex trafficking occurring at the Houston St Days Inn.

99.    Despite having actual or constructive knowledge of widespread and ongoing sex trafficking at the Houston St Days Inn, AMBM Investment Company, LLC continued renting rooms to these traffickers, including the rooms used to sexually exploit victims.

100.    AMBM Investment Company, LLC knew or was willfully blind to the fact that Jane Doe (A.A.M.) was being trafficked and, despite this, benefited from continued association with her traffickers by providing them a venue in the form of hotel rooms and related services, to facilitate Jane Doe (A.A.M.)'s sexual exploitation.

101.    AMBM Investment Company, LLC also facilitated widespread trafficking at the Houston St Days Inn, including the trafficking of Jane Doe (A.A.M.), in ways including:

   a. developing relationships with traffickers, including (A.A.M.)'s trafficker, and creating an understanding that these traffickers could operate at the hotel without risk of interference;

   b. continuing to provide rooms, services, and assistance to traffickers in the face of obvious "red flags" of trafficking of (A.A.M.) and other victims;

   c. allowing inappropriate and inadequate practices for hiring, training, supervising, managing, and disciplining front-line staff regarding issues related to human trafficking;

d.  inadequate and inadequately enforced sex trafficking notice and training for hotel staff;

e.  failing to contact law enforcement despite obvious indicia of criminal activity, including sex trafficking, occurring on site;

f.  choosing not to report known or suspected criminal activity including sex trafficking according to reasonable practices, industry standards, and/or applicable franchisor policies and procedures;

g.  implicitly encouraging the activities of traffickers by creating an environment where they did not need to incur the burden of taking significant steps to conceal their activities but, instead, could operate without concern for detection or interference by the hotel staff;

h.  providing rooms in a designated area of the property that at the end of a back hallway but next to a door that was kept unlocked, thus both allowing ease of access for "johns" but also minimizing risks of detection; and

i.  accommodating specific requests made by traffickers.

102.  AMBM Investment Company, LLC's acts and omissions, which were motivated by a single-minded focus on profit-maximization, showed serious indifference to and callous disregard for the rights of sex trafficking victims, including (A.A.M.)

103.  AMBM Investment Company, LLC knew that sex trafficking causes immeasurable harm to victims and, nonetheless, knowingly or recklessly engaged in a longstanding pattern of conduct that generated revenue by facilitating that trafficking.

104.  Policies purportedly enacted and enforced by Wyndham Defendants to identify signs of sex trafficking and stop it from occurring were not properly implemented at the Houston St Days Inn by either Wyndham Defendants or AMBM Investment Company, LLC. Jane Doe (A.A.M.)'s trafficker was able to continue the trafficking venture at the Houston St Days Inn. Had Franchisor Defendants enforced the policies and procedures they enacted to prevent trafficking from occurring within their branded hotels after observing an obvious sign of trafficking as described above, (A.A.M.)'s trafficking would have been identified and reported, which would

have prevented her trafficking at the Houston St Days Inn. Furthermore, had AMBM Investment Company, LLC properly followed the franchise policies enacted by Franchisors to identify and prevent trafficking from occurring at branded hotels as described above, Jane Doe (A.A.M.)'s trafficking would have been identified and reported, which would have prevented her trafficking at the Houston St Days Inn.

### b. Binue George, as a manager of AMBM Investment Company, LLC, facilitated the trafficking of Jane Doe (A.A.M.).

105.    Binue George, as an acting manager of AMBM Investment Company, LLC, is responsible for the acts, omissions, and knowledge of all employees of the Houston St Days Inn when operating the hotel because these acts and omissions were committed in the course and scope of employment, because Binue George ratified these acts and omissions, and because Binue George failed to exercise reasonable care with regard to the hiring, training, and supervision of these employees given the specific risks, known to Binue George, of sex trafficking occurring at the Houston St Days Inn.

106.    Despite having actual or constructive knowledge of widespread and ongoing sex trafficking at the Houston St Days Inn, Binue George continued renting rooms to these traffickers, including the rooms used to sexually exploit victims.

107.    Binue George  knew or was willfully blind to the fact that Jane Doe (A.A.M.) was being trafficked and, despite this, benefited from continued association with her traffickers by providing them a venue in the form of hotel rooms and related services, to facilitate Jane Doe (A.A.M.)'s sexual exploitation.

108.    Binue George also facilitated widespread trafficking at the Houston St Days Inn, including the trafficking of Jane Doe (A.A.M.), in ways including:

40

a. developing relationships with traffickers, including (A.A.M.)'s trafficker, and creating an understanding that these traffickers could operate at the hotel without risk of interference;

b. continuing to provide rooms, services, and assistance to traffickers in the face of obvious "red flags" of trafficking of (A.A.M.) and other victims;

c. allowing inappropriate and inadequate practices for hiring, training, supervising, managing, and disciplining front-line staff regarding issues related to human trafficking;

d. inadequate and inadequately enforced sex trafficking notice and training for hotel staff;

e. failing to contact law enforcement despite obvious indicia of criminal activity, including sex trafficking, occurring on site;

f. choosing not to report known or suspected criminal activity including sex trafficking according to reasonable practices, industry standards, and/or applicable franchisor policies and procedures;

g. implicitly encouraging the activities of traffickers by creating an environment where they did not need to incur the burden of taking significant steps to conceal their activities but, instead, could operate without concern for detection or interference by the hotel staff;

h. providing rooms in a designated area of the property that at the end of a back hallway but next to a door that was kept unlocked, thus both allowing ease of access for "johns" but also minimizing risks of detection; and

i. accommodating specific requests made by traffickers.

109. Binue George's acts and omissions, which were motivated by a single-minded focus on profit-maximization, showed serious indifference to and callous disregard for the rights of sex trafficking victims, including (A.A.M.)

110. Binue George knew that sex trafficking causes immeasurable harm to victims and, nonetheless, knowingly or recklessly engaged in a longstanding pattern of conduct that generated revenue by facilitating that trafficking.

111.    Policies purportedly enacted and enforced by Wyndham Defendants to identify signs of sex trafficking and stop it from occurring were not properly implemented at the Houston St Days Inn by either Wyndham Defendants or Binue George. Jane Doe (A.A.M.)'s trafficker was able to continue the trafficking venture at the Houston St Days Inn. Had Franchisor Defendants enforced the policies and procedures they enacted to prevent trafficking from occurring within their branded hotels after observing an obvious sign of trafficking as described above, (A.A.M.)'s trafficking would have been identified and reported, which would have prevented her trafficking at the Houston St Days Inn. Furthermore, had Binue George properly followed the franchise policies enacted by Franchisors to identify and prevent trafficking from occurring at branded hotels as described above, Jane Doe (A.A.M.)'s trafficking would have been identified and reported, which would have prevented her trafficking at the Houston St Days Inn.

**c. Michael Abraham, as a manager of AMBM Investment Company, LLC, facilitated the trafficking of Jane Doe (A.A.M.).**

112.    Michael Abraham, as an acting manager of AMBM Investment Company, LLC, is responsible for the acts, omissions, and knowledge of all employees of the Houston St Days Inn when operating the hotel because these acts and omissions were committed in the course and scope of employment, because Michael Abraham ratified these acts and omissions, and because Michael Abraham failed to exercise reasonable care with regard to the hiring, training, and supervision of these employees given the specific risks, known to Michael Abraham, of sex trafficking occurring at the Houston St Days Inn.

113.    Despite having actual or constructive knowledge of widespread and ongoing sex trafficking at the Houston St Days Inn, Michael Abraham continued renting rooms to these traffickers, including the rooms used to sexually exploit victims.

42

114. Michael Abraham knew or was willfully blind to the fact that Jane Doe (A.A.M.) was being trafficked and, despite this, benefited from continued association with her traffickers by providing them a venue in the form of hotel rooms and related services, to facilitate Jane Doe (A.A.M.)'s sexual exploitation.

115. Michael Abraham also facilitated widespread trafficking at the Houston St Days Inn, including the trafficking of Jane Doe (A.A.M.), in ways including:

   a. developing relationships with traffickers, including (A.A.M.)'s trafficker, and creating an understanding that these traffickers could operate at the hotel without risk of interference;

   b. continuing to provide rooms, services, and assistance to traffickers in the face of obvious "red flags" of trafficking of (A.A.M.) and other victims;

   c. allowing inappropriate and inadequate practices for hiring, training, supervising, managing, and disciplining front-line staff regarding issues related to human trafficking;

   d. inadequate and inadequately enforced sex trafficking notice and training for hotel staff;

   e. failing to contact law enforcement despite obvious indicia of criminal activity, including sex trafficking, occurring on site;

   f. choosing not to report known or suspected criminal activity including sex trafficking according to reasonable practices, industry standards, and/or applicable franchisor policies and procedures;

   g. implicitly encouraging the activities of traffickers by creating an environment where they did not need to incur the burden of taking significant steps to conceal their activities but, instead, could operate without concern for detection or interference by the hotel staff;

   h. providing rooms in a designated area of the property that at the end of a back hallway but next to a door that was kept unlocked, thus both allowing ease of access for "johns" but also minimizing risks of detection; and

   i. accommodating specific requests made by traffickers.

116. Michael Abraham's acts and omissions, which were motivated by a single-minded focus on profit-maximization, showed serious indifference to and callous disregard for the rights of sex trafficking victims, including (A.A.M.)

117. Michael Abraham knew that sex trafficking causes immeasurable harm to victims and, nonetheless, knowingly or recklessly engaged in a longstanding pattern of conduct that generated revenue by facilitating that trafficking.

118. Policies purportedly enacted and enforced by Wyndham Defendants to identify signs of sex trafficking and stop it from occurring were not properly implemented at the Houston St Days Inn by either Wyndham Defendants or Michael Abraham. Jane Doe (A.A.M.)'s trafficker was able to continue the trafficking venture at the Houston St Days Inn. Had Franchisor Defendants enforced the policies and procedures they enacted to prevent trafficking from occurring within their branded hotels after observing an obvious sign of trafficking as described above, (A.A.M.)'s trafficking would have been identified and reported, which would have prevented her trafficking at the Houston St Days Inn. Furthermore, had Michael Abraham properly followed the franchise policies enacted by Franchisors to identify and prevent trafficking from occurring at branded hotels as described above, Jane Doe (A.A.M.)'s trafficking would have been identified and reported, which would have prevented her trafficking at the Houston St Days Inn.

**d. S G Hospitality, LLC d/b/a Days Inn facilitated the trafficking of Jane Doe (A.A.M.).**

119. S G Hospitality, LLC is responsible for the acts, omissions, and knowledge of all employees of the Houston St Days Inn when operating the hotel because these acts and omissions were committed in the course and scope of employment, because S G Hospitality, LLC ratified these acts and omissions, and because S G Hospitality, LLC failed to exercise reasonable care with

44

regard to the hiring, training, and supervision of these employees given the specific risks, known to S G Hospitality, LLC, of sex trafficking occurring at the Houston St Days Inn.

120.    Despite having actual or constructive knowledge of widespread and ongoing sex trafficking at the Houston St Days Inn, S G Hospitality, LLC continued renting rooms to these traffickers, including the rooms used to sexually exploit victims.

121.    S G Hospitality, LLC knew or was willfully blind to the fact that Jane Doe (A.A.M.) was being trafficked and, despite this, benefited from continued association with her traffickers by providing them a venue in the form of hotel rooms and related services, to facilitate Jane Doe (A.A.M.)'s sexual exploitation.

122.    S G Hospitality, LLC also facilitated widespread trafficking at the Houston St Days Inn, including the trafficking of Jane Doe (A.A.M.), in ways including:

a.  developing relationships with traffickers, including (A.A.M.)'s trafficker, and creating an understanding that these traffickers could operate at the hotel without risk of interference;

b.  continuing to provide rooms, services, and assistance to traffickers in the face of obvious "red flags" of trafficking of (A.A.M.) and other victims;

c.  allowing inappropriate and inadequate practices for hiring, training, supervising, managing, and disciplining front-line staff regarding issues related to human trafficking;

d.  inadequate and inadequately enforced sex trafficking notice and training for hotel staff;

e.  failing to contact law enforcement despite obvious indicia of criminal activity, including sex trafficking, occurring on site;

f.  choosing not to report known or suspected criminal activity including sex trafficking according to reasonable practices, industry standards, and/or applicable franchisor policies and procedures;

g.  implicitly encouraging the activities of traffickers by creating an environment where they did not need to incur the burden of taking significant steps to conceal their activities but, instead, could operate without concern for detection or interference by the hotel staff;

45

h.  providing rooms in a designated area of the property that at the end of a back hallway but next to a door that was kept unlocked, thus both allowing ease of access for "johns" but also minimizing risks of detection; and

i.  accommodating specific requests made by traffickers.

123.  S G Hospitality, LLC's acts and omissions, which were motivated by a single-minded focus on profit-maximization, showed serious indifference to and callous disregard for the rights of sex trafficking victims, including (A.A.M.)

124.  S G Hospitality, LLC knew that sex trafficking causes immeasurable harm to victims and, nonetheless, knowingly or recklessly engaged in a longstanding pattern of conduct that generated revenue by facilitating that trafficking.

125.  Policies purportedly enacted and enforced by Wyndham Defendants to identify signs of sex trafficking and stop it from occurring were not properly implemented at the Houston St Days Inn by either Wyndham Defendants or S G Hospitality, LLC. Jane Doe (A.A.M.)'s trafficker was able to continue the trafficking venture at the Houston St Days Inn. Had Franchisor Defendants enforced the policies and procedures they enacted to prevent trafficking from occurring within their branded hotels after observing an obvious sign of trafficking as described above, (A.A.M.)'s trafficking would have been identified and reported, which would have prevented her trafficking at the Houston St Days Inn. Furthermore, had S G Hospitality, LLC properly followed the franchise policies enacted by Franchisors to identify and prevent trafficking from occurring at branded hotels as described above, Jane Doe (A.A.M.)'s trafficking would have been identified and reported, which would have prevented her trafficking at the Houston St Days Inn.

e.  **MMSD Corporation d/b/a Days Inn facilitated the trafficking of Jane Doe (A.A.M.).**

46

126.    MMSD Corporation is responsible for the acts, omissions, and knowledge of all employees of the Houston St Days Inn when operating the hotel because these acts and omissions were committed in the course and scope of employment, because MMSD Corporation ratified these acts and omissions, and because MMSD Corporation failed to exercise reasonable care with regard to the hiring, training, and supervision of these employees given the specific risks, known to MMSD Corporation, of sex trafficking occurring at the Houston St Days Inn.

127.    Despite having actual or constructive knowledge of widespread and ongoing sex trafficking at the Houston St Days Inn, MMSD Corporation continued renting rooms to these traffickers, including the rooms used to sexually exploit victims.

128.    MMSD Corporation knew or was willfully blind to the fact that Jane Doe (A.A.M.) was being trafficked and, despite this, benefited from continued association with her traffickers by providing them a venue in the form of hotel rooms and related services, to facilitate Jane Doe (A.A.M.)'s sexual exploitation.

129.    MMSD Corporation also facilitated widespread trafficking at the Houston St Days Inn, including the trafficking of Jane Doe (A.A.M.), in ways including:

   a.  developing relationships with traffickers, including (A.A.M.)'s trafficker, and creating an understanding that these traffickers could operate at the hotel without risk of interference;

   b.  continuing to provide rooms, services, and assistance to traffickers in the face of obvious "red flags" of trafficking of (A.A.M.) and other victims;

   c.  allowing inappropriate and inadequate practices for hiring, training, supervising, managing, and disciplining front-line staff regarding issues related to human trafficking;

   d.  inadequate and inadequately enforced sex trafficking notice and training for hotel staff;

   e.  failing to contact law enforcement despite obvious indicia of criminal activity, including sex trafficking, occurring on site;

47

f.  choosing not to report known or suspected criminal activity including sex trafficking according to reasonable practices, industry standards, and/or applicable franchisor policies and procedures;

g.  implicitly encouraging the activities of traffickers by creating an environment where they did not need to incur the burden of taking significant steps to conceal their activities but, instead, could operate without concern for detection or interference by the hotel staff;

h.  providing rooms in a designated area of the property that at the end of a back hallway but next to a door that was kept unlocked, thus both allowing ease of access for "johns" but also minimizing risks of detection; and

i.  accommodating specific requests made by traffickers.

130.  MMSD Corporation's acts and omissions, which were motivated by a single-minded focus on profit-maximization, showed serious indifference to and callous disregard for the rights of sex trafficking victims, including (A.A.M.)

131.  MMSD Corporation knew that sex trafficking causes immeasurable harm to victims and, nonetheless, knowingly or recklessly engaged in a longstanding pattern of conduct that generated revenue by facilitating that trafficking.

132.  Policies purportedly enacted and enforced by Wyndham Defendants to identify signs of sex trafficking and stop it from occurring were not properly implemented at the Houston St Days Inn by either Wyndham Defendants or MMSD Corporation. Jane Doe (A.A.M.)'s trafficker was able to continue the trafficking venture at the Houston St Days Inn. Had Franchisor Defendants enforced the policies and procedures they enacted to prevent trafficking from occurring within their branded hotels after observing an obvious sign of trafficking as described above, (A.A.M.)'s trafficking would have been identified and reported, which would have prevented her trafficking at the Houston St Days Inn. Furthermore, had MMSD Corporation properly followed the franchise policies enacted by Franchisors to identify and prevent trafficking from occurring at

48

branded hotels as described above, Jane Doe (A.A.M.)'s trafficking would have been identified and reported, which would have prevented her trafficking at the Houston St Days Inn.

**f.  D. LAXMI, Inc. d/b/a Days Inn facilitated the trafficking of Jane Doe (A.A.M.).**

133.    D. LAXMI, Inc. is responsible for the acts, omissions, and knowledge of all employees of the I-10 Days Inn when operating the hotel because these acts and omissions were committed in the course and scope of employment, because D. LAXMI, Inc. ratified these acts and omissions, and because D. LAXMI, Inc. failed to exercise reasonable care with regard to the hiring, training, and supervision of these employees given the specific risks, known to D. LAXMI, Inc., of sex trafficking occurring at the I-10 Days Inn.

134.    Despite having actual or constructive knowledge of widespread and ongoing sex trafficking at the I-10 Days Inn, D. LAXMI, Inc. continued renting rooms to these traffickers, including the rooms used to sexually exploit victims.

135.    D. LAXMI, Inc.knew or was willfully blind to the fact that Jane Doe (A.A.M.) was being trafficked and, despite this, benefited from continued association with her traffickers by providing them a venue in the form of hotel rooms and related services, to facilitate Jane Doe (A.A.M.)'s sexual exploitation.

136.    D. LAXMI, Inc. also facilitated widespread trafficking at the I-10 Days Inn, including the trafficking of Jane Doe (A.A.M.), in ways including:

- a.  developing relationships with traffickers, including (A.A.M.)'s trafficker, and creating an understanding that these traffickers could operate at the hotel without risk of interference;

- b.  continuing to provide rooms, services, and assistance to traffickers in the face of obvious "red flags" of trafficking of (A.A.M.) and other victims;

- c.  allowing inappropriate and inadequate practices for hiring, training, supervising, managing, and disciplining front-line staff regarding issues related to human trafficking;

49

d. inadequate and inadequately enforced sex trafficking notice and training for hotel staff;

e. failing to contact law enforcement despite obvious indicia of criminal activity, including sex trafficking, occurring on site;

f. choosing not to report known or suspected criminal activity including sex trafficking according to reasonable practices, industry standards, and/or applicable franchisor policies and procedures;

g. implicitly encouraging the activities of traffickers by creating an environment where they did not need to incur the burden of taking significant steps to conceal their activities but, instead, could operate without concern for detection or interference by the hotel staff;

h. providing rooms in a designated area of the property that at the end of a back hallway but next to a door that was kept unlocked, thus both allowing ease of access for "johns" but also minimizing risks of detection; and

i. accommodating specific requests made by traffickers.

137. D. LAXMI, Inc.'s acts and omissions, which were motivated by a single-minded focus on profit-maximization, showed serious indifference to and callous disregard for the rights of sex trafficking victims, including (A.A.M.)

138. D. LAXMI, Inc. knew that sex trafficking causes immeasurable harm to victims and, nonetheless, knowingly or recklessly engaged in a longstanding pattern of conduct that generated revenue by facilitating that trafficking.

139. Policies purportedly enacted and enforced by Wyndham Defendants to identify signs of sex trafficking and stop it from occurring were not properly implemented at the I-10 Days Inn by either Wyndham Defendants or D. LAXMI, Inc. Jane Doe (A.A.M.)'s trafficker was able to continue the trafficking venture at the I-10 Days Inn. Had Franchisor Defendants enforced the policies and procedures they enacted to prevent trafficking from occurring within their branded hotels after observing an obvious sign of trafficking as described above, (A.A.M.)'s trafficking would have been identified and reported, which would have prevented her trafficking at the I-10

Days Inn. Furthermore, had D. LAXMI, Inc. properly followed the franchise policies enacted by Franchisors to identify and prevent trafficking from occurring at branded hotels as described above, Jane Doe (A.A.M.)'s trafficking would have been identified and reported, which would have prevented her trafficking at the I-10 Days Inn.

g. **Ashvin Kumar Patel, as a Manger for D. LAXMI, Inc. d/b/a Days Inn and OM SAI RAM LLC d/b/a Days Inn, facilitated the trafficking of Jane Doe (A.A.M.).**

140. Ashvin Kumar Patel, as an acting manager for D. LAXMI, Inc. and OM SAI RAM LLC, is responsible for the acts, omissions, and knowledge of all employees of the I-10 Days Inn when operating the hotel because these acts and omissions were committed in the course and scope of employment, because Ashvin Kumar Patel ratified these acts and omissions, and because Ashvin Kumar Patel failed to exercise reasonable care with regard to the hiring, training, and supervision of these employees given the specific risks, known to Ashvin Kumar Patel, of sex trafficking occurring at the I-10 Days Inn.

141. Despite having actual or constructive knowledge of widespread and ongoing sex trafficking at the I-10 Days Inn, Ashvin Kumar Patel continued renting rooms to these traffickers, including the rooms used to sexually exploit victims.

142. Ashvin Kumar Patel knew or was willfully blind to the fact that Jane Doe (A.A.M.) was being trafficked and, despite this, benefited from continued association with her traffickers by providing them a venue in the form of hotel rooms and related services, to facilitate Jane Doe (A.A.M.)'s sexual exploitation.

143. Ashvin Kumar Patel also facilitated widespread trafficking at the I-10 Days Inn, including the trafficking of Jane Doe (A.A.M.), in ways including:

a. developing relationships with traffickers, including (A.A.M.)'s trafficker, and creating an understanding that these traffickers could operate at the hotel without risk of interference;

b. continuing to provide rooms, services, and assistance to traffickers in the face of obvious "red flags" of trafficking of (A.A.M.) and other victims;

c. allowing inappropriate and inadequate practices for hiring, training, supervising, managing, and disciplining front-line staff regarding issues related to human trafficking;

d. inadequate and inadequately enforced sex trafficking notice and training for hotel staff;

e. failing to contact law enforcement despite obvious indicia of criminal activity, including sex trafficking, occurring on site;

f. choosing not to report known or suspected criminal activity including sex trafficking according to reasonable practices, industry standards, and/or applicable franchisor policies and procedures;

g. implicitly encouraging the activities of traffickers by creating an environment where they did not need to incur the burden of taking significant steps to conceal their activities but, instead, could operate without concern for detection or interference by the hotel staff;

h. providing rooms in a designated area of the property that at the end of a back hallway but next to a door that was kept unlocked, thus both allowing ease of access for "johns" but also minimizing risks of detection; and

i. accommodating specific requests made by traffickers.

144. Ashvin Kumar Patel's acts and omissions, which were motivated by a single-minded focus on profit-maximization, showed serious indifference to and callous disregard for the rights of sex trafficking victims, including (A.A.M.)

145. Ashvin Kumar Patel knew that sex trafficking causes immeasurable harm to victims and, nonetheless, knowingly or recklessly engaged in a longstanding pattern of conduct that generated revenue by facilitating that trafficking.

146. Policies purportedly enacted and enforced by Wyndham Defendants to identify signs of sex trafficking and stop it from occurring were not properly implemented at the I-10 Days Inn by either Wyndham Defendants or Ashvin Kumar Patel Jane Doe (A.A.M.)'s trafficker was able to continue the trafficking venture at the I-10 Days Inn. Had Franchisor Defendants enforced the policies and procedures they enacted to prevent trafficking from occurring within their branded hotels after observing an obvious sign of trafficking as described above, (A.A.M.)'s trafficking would have been identified and reported, which would have prevented her trafficking at the I-10 Days Inn. Furthermore, had Ashvin Kumar Patel properly followed the franchise policies enacted by Franchisors to identify and prevent trafficking from occurring at branded hotels as described above, Jane Doe (A.A.M.)'s trafficking would have been identified and reported, which would have prevented her trafficking at the I-10 Days Inn.

### h. Kantilal Patel, as a Manger for D. LAXMI, Inc. d/b/a Days Inn, facilitated the trafficking of Jane Doe (A.A.M.).

147. Kantilal Patel, as an acting manager for D. LAXMI, Inc., is responsible for the acts, omissions, and knowledge of all employees of the I-10 Days Inn when operating the hotel because these acts and omissions were committed in the course and scope of employment, because Kantilal Patel ratified these acts and omissions, and because Kantilal Patel failed to exercise reasonable care with regard to the hiring, training, and supervision of these employees given the specific risks, known to Kantilal Patel, of sex trafficking occurring at the I-10 Days Inn.

148. Despite having actual or constructive knowledge of widespread and ongoing sex trafficking at the I-10 Days Inn, Kantilal Patel continued renting rooms to these traffickers, including the rooms used to sexually exploit victims.

53

149.    Kantilal Patel knew or was willfully blind to the fact that Jane Doe (A.A.M.) was being trafficked and, despite this, benefited from continued association with her traffickers by providing them a venue in the form of hotel rooms and related services, to facilitate Jane Doe (A.A.M.)'s sexual exploitation.

150.    Kantilal Patel also facilitated widespread trafficking at the I-10 Days Inn, including the trafficking of Jane Doe (A.A.M.), in ways including:

a.  developing relationships with traffickers, including (A.A.M.)'s trafficker, and creating an understanding that these traffickers could operate at the hotel without risk of interference;

b.  continuing to provide rooms, services, and assistance to traffickers in the face of obvious "red flags" of trafficking of (A.A.M.) and other victims;

c.  allowing inappropriate and inadequate practices for hiring, training, supervising, managing, and disciplining front-line staff regarding issues related to human trafficking;

d.  inadequate and inadequately enforced sex trafficking notice and training for hotel staff;

e.  failing to contact law enforcement despite obvious indicia of criminal activity, including sex trafficking, occurring on site;

f.  choosing not to report known or suspected criminal activity including sex trafficking according to reasonable practices, industry standards, and/or applicable franchisor policies and procedures;

g.  implicitly encouraging the activities of traffickers by creating an environment where they did not need to incur the burden of taking significant steps to conceal their activities but, instead, could operate without concern for detection or interference by the hotel staff;

h.  providing rooms in a designated area of the property that at the end of a back hallway but next to a door that was kept unlocked, thus both allowing ease of access for "johns" but also minimizing risks of detection; and

i.  accommodating specific requests made by traffickers.

151.    Kantilal Patel's acts and omissions, which were motivated by a single-minded focus on profit-maximization, showed serious indifference to and callous disregard for the rights of sex trafficking victims, including (A.A.M.)

152.    Kantilal Patel knew that sex trafficking causes immeasurable harm to victims and, nonetheless, knowingly or recklessly engaged in a longstanding pattern of conduct that generated revenue by facilitating that trafficking.

153.    Policies purportedly enacted and enforced by Wyndham Defendants to identify signs of sex trafficking and stop it from occurring were not properly implemented at the I-10 Days Inn by either Wyndham Defendants or Kantilal Patel Jane Doe (A.A.M.)'s trafficker was able to continue the trafficking venture at the I-10 Days Inn. Had Franchisor Defendants enforced the policies and procedures they enacted to prevent trafficking from occurring within their branded hotels after observing an obvious sign of trafficking as described above, (A.A.M.)'s trafficking would have been identified and reported, which would have prevented her trafficking at the I-10 Days Inn. Furthermore, had Kantilal Patel properly followed the franchise policies enacted by Franchisors to identify and prevent trafficking from occurring at branded hotels as described above, Jane Doe (A.A.M.)'s trafficking would have been identified and reported, which would have prevented her trafficking at the I-10 Days Inn.

   **i.    Hotel OM SAI RAM LLC d/b/a Days Inn facilitated the trafficking of Jane Doe (A.A.M.).**

154.    Hotel OM SAI RAM LLC is responsible for the acts, omissions, and knowledge of all employees of the I-10 Days Inn when operating the hotel because these acts and omissions were committed in the course and scope of employment, because Hotel OM SAI RAM LLC ratified

these acts and omissions, and because Hotel OM SAI RAM LLC failed to exercise reasonable care with regard to the hiring, training, and supervision of these employees given the specific risks, known to Hotel OM SAI RAM LLC, of sex trafficking occurring at the I-10 Days Inn.

155.    Despite having actual or constructive knowledge of widespread and ongoing sex trafficking at the I-10 Days Inn, Hotel OM SAI RAM LLC continued renting rooms to these traffickers, including the rooms used to sexually exploit victims.

156.    Hotel OM SAI RAM LLC knew or was willfully blind to the fact that Jane Doe (A.A.M.) was being trafficked and, despite this, benefited from continued association with her traffickers by providing them a venue in the form of hotel rooms and related services, to facilitate Jane Doe (A.A.M.)'s sexual exploitation.

157.    Hotel OM SAI RAM LLC also facilitated widespread trafficking at the I-10 Days Inn, including the trafficking of Jane Doe (A.A.M.), in ways including:

a. developing relationships with traffickers, including (A.A.M.)'s trafficker, and creating an understanding that these traffickers could operate at the hotel without risk of interference;

b. continuing to provide rooms, services, and assistance to traffickers in the face of obvious "red flags" of trafficking of (A.A.M.) and other victims;

c. allowing inappropriate and inadequate practices for hiring, training, supervising, managing, and disciplining front-line staff regarding issues related to human trafficking;

d. inadequate and inadequately enforced sex trafficking notice and training for hotel staff;

e. failing to contact law enforcement despite obvious indicia of criminal activity, including sex trafficking, occurring on site;

f. choosing not to report known or suspected criminal activity including sex trafficking according to reasonable practices, industry standards, and/or applicable franchisor policies and procedures;

g. implicitly encouraging the activities of traffickers by creating an environment where they did not need to incur the burden of taking significant steps to conceal

56

their activities but, instead, could operate without concern for detection or interference by the hotel staff;

h.  providing rooms in a designated area of the property that at the end of a back hallway but next to a door that was kept unlocked, thus both allowing ease of access for "johns" but also minimizing risks of detection; and

i.  accommodating specific requests made by traffickers.

158.  Hotel OM SAI RAM LLC's acts and omissions, which were motivated by a single-minded focus on profit-maximization, showed serious indifference to and callous disregard for the rights of sex trafficking victims, including (A.A.M.)

159.  Hotel OM SAI RAM LLC knew that sex trafficking causes immeasurable harm to victims and, nonetheless, knowingly or recklessly engaged in a longstanding pattern of conduct that generated revenue by facilitating that trafficking.

160.  Policies purportedly enacted and enforced by Wyndham Defendants to identify signs of sex trafficking and stop it from occurring were not properly implemented at the I-10 Days Inn by either Wyndham Defendants or Hotel OM SAI RAM LLC. Jane Doe (A.A.M.)'s trafficker was able to continue the trafficking venture at the I-10 Days Inn. Had Franchisor Defendants enforced the policies and procedures they enacted to prevent trafficking from occurring within their branded hotels after observing an obvious sign of trafficking as described above, (A.A.M.)'s trafficking would have been identified and reported, which would have prevented her trafficking at the I-10 Days Inn. Furthermore, had Hotel OM SAI RAM LLC properly followed the franchise policies enacted by Franchisors to identify and prevent trafficking from occurring at branded hotels as described above, Jane Doe (A.A.M.)'s trafficking would have been identified and reported, which would have prevented her trafficking at the I-10 Days Inn

**j.  Wyndham Defendants facilitated the trafficking of Jane Doe (A.A.M.).**

161.    Upon information and belief, the Wyndham Brand Defendants participated directly in aspects of the operation of the subject Wyndham properties that influenced whether and to what extent trafficking occurred at the hotel, including but not limited to the trafficking of Jane Doe (A.A.M.), as follows:

    a.    assuming joint responsibility with the franchisee for detecting and preventing human trafficking at the hotel property;

    b.    assuming or retaining control over and responsibility for adopting, monitoring, and enforcing policies and protocols requiring hotel staff to report suspected criminal or trafficking activity to the franchisor;

    c.    assuming or retaining control over and responsibility for training hotel staff on detecting and responding to human trafficking;

    d.    assuming or retaining control over and responsibility for adopting, monitoring, and enforcing policies and protocols regarding detecting and responding to human trafficking;

    e.    employing field-based associates who work with hotels on trafficking issues;

    f.    assessing or auditing hotel properties, specifically, for the purpose of evaluating whether safety and security measures related to trafficking are in place;

    g.    establishing systems for guests to report security issues to franchisor;

    h.    requiring franchisees to provide Wi-Fi/internet access to guests;

    i.    mandating the specific tools and systems that franchisees must use to provide Wi-Fi/internet access to guests;

    j.    setting policies and protocols regarding guest use of Wi-Fi/internet, filtering and site-blocking mechanisms deployed, and monitoring/tracking of guest usage;

    k.    requiring franchisees to use a system to monitor and track housekeeping requests;

    l.    setting policies for when and how housekeeping services are provided;

    m.    collecting and monitoring data that shows patterns of use of housekeeping services;

    n.    setting policies for when and how hotel staff can accept tips.

162. Wyndham Brand Defendants directly participated in and retained day-to-day control over renting rooms at the Subject Days Inn Locations by, among other things:

a. controlling all details of the guest reservation, check-in, and payment processes through management and control over all systems used for those processes and adoption of detailed and specific policies governing the means and methods used for each of these processes;

b. controlling and overseeing policies and procedures regarding check-in, payment, and identity verification procedures, including whether cash and prepaid cards could be used and who had to show identification;

c. requiring the franchisee to use the franchisor's centralized reservation system and preventing the franchisee from using any other system;

d. reserving rooms and accept payments without requiring franchisee approval or involvement;

e. controlling and restricting the ability of franchisee and staff to refuse or cancel a reservation.

f. requiring the franchisee to use a software system operated and controlled by the franchisor for booking rooms and checking guests into rooms;

g. requiring the franchisee to use a software system operated and controlled by the franchisor to process payments;

h. requiring the franchisee to use a property-management system operated and controlled by the franchisor;

i. requiring the franchisee to use a data-management system operated and controlled by the franchisor;

j. ensuring that data related to each room reservation passes through systems owned, maintained, and managed by the franchisor;

k. exercising control over the price of rooms;

l. controlling all details of the customer loyalty program that the franchisee was required to implement;

m. setting detailed policies for the check-in process, including requirements for identification and payment methods;

n.  collecting guest data, requiring franchisees to report guest data, and reviewing and analyzing guest data, including names, payment information, reservation history, internet browsing data, and other details associated with their stay;

o.  assuming sole ownership over all guest information; and

p.  overseeing do not rent (DNR) lists for its branded properties.

163.  The Wyndham Brand Defendants had a direct business relationship with traffickers operating at the Subject Days Inn Locations because, among other things, the Wyndham Brand Defendants directly rented rooms at the hotels, directly received payment, and received real-time guest information. Traffickers further developed a business relationship with the Wyndham Brand Defendants by developing brand loyalty and intentionally choosing Wyndham hotels because it was known they created a favorable environment for trafficking.

164.  Despite having actual or constructive knowledge of widespread and ongoing sex trafficking at the subject Wyndham properties, Wyndham Brand Defendants continued renting rooms to traffickers, including the rooms used to sexually exploit victims, including Jane Doe (A.A.M.).

165.  Wyndham Brand Defendants knew or should have known that Jane Doe (A.A.M.) was being trafficked and, despite this, benefited from continued association with her traffickers by providing them hotel rooms and related services to facilitate Jane Doe (A.A.M.)'s sexual exploitation.

166.  Upon information and belief, despite having actual or constructive knowledge of the ongoing sex trafficking at the subject Wyndham properties, the Wyndham Brand Defendants continued participating in a venture at that hotel, with its franchisees and the hotel staff, in a way that it knew or should have known would lead to additional sex trafficking at the hotel, including but not limited to by the following:

60

a. adopting, maintaining, and enforcing policies and practices regarding guest identification in a way that facilitated trafficking by allowing traffickers, including Jane Doe's traffickers, to secure rooms without providing their own identifying information;

b. adopting, maintaining, and enforcing policies and practices regarding payment methods in a way that facilitated trafficking by allowing traffickers, including Jane Doe's traffickers, to pay for rooms using non-traceable methods;

c. adopting and enforcing training methods for the franchisee and hotel staff in a way that led to widespread and ongoing trafficking at the hotel property;

d. adopting and enforcing policies and protocol regarding trafficking in a way that led to widespread and ongoing trafficking at the hotel property;

e. providing traffickers continued access to Franchisor-maintained internet systems despite having active or constructive knowledge this access was being used for advertising services related to their trafficking activities;

f. adopting inappropriate and inadequate practices for monitoring, supervising, and responding to issues regarding the conduct of Franchisee and hotel staff related to human trafficking at Subject Days Inn Locations; and

q. implicitly or explicitly encouraging franchisee to continue facilitating trafficking by continuing the same methods of operation at the hotel property despite obvious evidence that those methods were leading to widespread and ongoing sex trafficking.

167.   If Wyndham had exercised reasonable diligence when operating the Wyndham properties and in the areas where it retained control, Wyndham would have prevented the Wyndham properties from being used to facilitate widespread and ongoing sex trafficking, including the trafficking of Jane Doe (A.A.M.). Instead, Wyndham engaged in the course of conduct that affirmatively facilitated widespread and ongoing sex trafficking, including the trafficking of Jane Doe (A.A.M.)

168.   The Wyndham Brand Defendants should have known about Jane Doe (A.A.M.)'s trafficking because it retained control over the training of the staff of the Subject Days Inn Locations regarding human trafficking and ways to detect and respond to signs of human trafficking. Effective training and education are the most important tools to prevent use of hotel

facilities for sexual exploitation and human trafficking. If the Wyndham Brand Defendants had exercised reasonable diligence in providing training, they would have known about the obvious and apparent sex trafficking, including the trafficking of (A.A.M.) at the Subject Days Inn Locations. Thus, under §1595(a) of the TVPRA, constructive knowledge of that trafficking is imputed to the Wyndham Brand Defendants.

169.    The Wyndham Brand Defendants should have known about Jane Doe (A.A.M.)'s trafficking because they also retained control over the response of Wyndham hotels to human trafficking, including development of policies and procedure regarding detection, disruption of and response to human trafficking. By failing to exercise reasonable diligence in discharge of this duty, the Wyndham Brand Defendants facilitated sex trafficking, including the sex trafficking of (A.A.M.) in their hotel. Thus, under §1595(a) of the TVPRA, constructive knowledge of that trafficking is imputed to the Wyndham Brand Defendants.

170.    The Wyndham Brand Defendants also should have known about Jane Doe (A.A.M.)'s trafficking because they retained the control to adopt and enforce policies on sex trafficking for their properties, including Subject Days Inn Locations, adopted and enforced inadequate and inappropriate check-in, payment, and identification policies, which facilitated trafficking at the Subject Days Inn Locations. The Wyndham Brand Defendants and allowed traffickers to access rooms for the purpose of harboring their victims, including Jane Doe (A.A.M.) Thus, under §1595(a) of the TVPRA, constructive knowledge of that trafficking is imputed to the Wyndham Brand Defendants.

171.    The Wyndham Brand Defendants also should have known about Jane Doe (A.A.M.)'s trafficking because they retained control over the security of the Subject Days Inn Locations through various means including, upon information and belief, placing and monitoring

62

security cameras, accepting and reviewing and responding to customer complaints, and inspecting the Subject Days Inn Locations. They also collected data regarding hotel operations and customers, including names, payment information, payment method, reservation history, wi-fi browsing data, and other details associated with their stay. If the Wyndham Brand Defendants had used reasonable prudence in monitoring and reviewing this information, they would have known about the ongoing trafficking. Thus, under §1595(a) of the TVPRA, constructive knowledge of that trafficking is imputed to the Wyndham Brand Defendants.

172.    Jane Doe (A.A.M.) exhibited the kind of obvious signs of sex trafficking that would have been detectable and detected if the Wyndham Brand Defendants had used reasonable diligence in the aspects of hotel operations over which they retained control.

173.    Moreover, Jane Doe (A.A.M.)'s trafficker was able to operate without interference and without making significant effort at a concealment during repeated visits to the Subject Days Inn Locations over an extended period because the Wyndham Brand Defendants adopted policies and practices that insulated Jane Doe (A.A.M.)'s trafficker from significant risk of detection or disruption.

## V.    Defendants' Ventures at the Subject Days Inn Locations.

174.    Each of the Wyndham Brand Defendants generated substantial income from the Subject Days Inn Locations, receiving a share of the profits from room rentals collected at the hotel. The fees generated by the Wyndham Brand Defendants were primarily based on gross room rentals; therefore, the Wyndham Brand Defendants' profits increased with each room rental at the Subject Days Inn Locations, including each room rented to a trafficker. Revenue generated from rooms rented at the Subject Days Inn Locations was distributed among the Wyndham Brand Defendants, with each benefiting from each rental of a hotel room to a trafficker, including Jane Doe (A.A.M.)'s trafficker.

175.    Franchisees profited from every room rented to a trafficker or for use in trafficking at the Subject Days Inn Locations, both from the room fee and from fees for other hotel services.

176.    In ways described more fully above, the Wyndham Brand Defendants and Franchisees knowingly received a financial benefit from participating in a venture in the form of a continuous business relationship and implicit understanding with the population of sex traffickers operating out of the Subject Days Inn Locations, including Jane Doe (A.A.M.)'s trafficker. (hereinafter "**Venture 1**").

177.    The Wyndham Brand Defendants and Franchisee Defendants formed this continuous business relationship and implicit understanding with the traffickers at the Subject Days Inn Locations by continuing to rent rooms to be used for trafficking (including (A.A.M.)'s trafficking) after the Wyndham Brand Defendants and Franchisees knew or should have known that the rooms were being used for unlawful trafficking.

178.    This business relationship involved mutual pursuant of financial benefit: the traffickers were renting the hotel rooms to generate revenue from sex trafficking and the Wyndham Brand Defendants and Franchisee Defendants were generating revenue by renting the hotel rooms.

179.    This implicit understanding developed because sex traffickers, including Jane Doe (A.A.M.)'s trafficker, frequently used the Subject Days Inn Locations for their trafficking knowing that staff members would look the other way. This occurred because of the acts and omissions of the Wyndham Brand Defendants and Franchisees that created a favorable environment for sex trafficking to flourish.

180.    Both the Wyndham Brand Defendants and Franchisee Defendants participated in this venture by acting jointly to rent rooms to traffickers and to operate the hotel in a way that attracted business from traffickers and facilitated their trafficking activity. As further described

64

above, Franchisee Defendants provided "boots on the ground" at the hotel, and the Wyndham Brand Defendants played a primary role in renting rooms at the Subject Days Inn Locations and retained control over and was directly involved in aspects of hotel operations related to sex trafficking.

181.     The Wyndham Brand Defendants and Franchisees participated in the venture by continually renting rooms to traffickers, including Jane Doe (A.A.M.)'s, after they knew or should have known that victims like Jane Doe (A.A.M.) were being subjected to unlawful trafficking. They also continued operating the hotel in a way that they knew or should have known would encourage traffickers to select the Subject Days Inn Locations as a venue for their illegal activities.

182.     Wyndham Brand Defendants and Franchisee Defendants did not only provide these traffickers with a physical space (harboring) where they could imprison victims and sell them "johns" (providing), but they also provided these traffickers with the cover of a legitimate business as a venue where they could profit from sexual exploitation with a low risk of disruption. This was done pursuant to an implicit agreement with Defendants, which is evidenced by, among other things:

    a. The population of traffickers, including Jane Doe (A.A.M.)'s, were familiar to the staff at the Subject Days Inn Locations;

    b. These traffickers reduced their operating burden because they did not need to make significant efforts to conceal their activities from the staff at the Subject Days Inn Locations but, instead, freely made requests that would facilitate their trafficking activities without concern for detection or interference by the staff;

    c. Defendants allowed traffickers to take steps that would minimize their traceability to law enforcement, such as accepting cash payments and not requiring identification from appropriate parties;

    d. Defendants provided additional services to traffickers (including Jane Doe (A.A.M.)'s trafficker), including but not limited to, internet access, excessive towels, and extra housekeeping services to clean the activities of the trafficking venture once the traffickers vacated the rooms; and

65

e.  The staff designated an area of the hotel for traffickers, which facilitated their illegal activities.

183. The criminal traffickers operating at the Subject Days Inn Locations as part of Venture 1 violated 18 U.S.C. §1591 as to victims including Jane Doe (A.A.M.)

184. If Wyndham Brand Defendants and Franchisee Defendants had not continued participating in a venture that they knew or should have known engaged in violations of the TVPRA, they would not have received a benefit from Jane Doe (A.A.M.)'s trafficking at Subject Days Inn Locations.

185. In ways described more fully above, the Wyndham Brand Defendants and Franchisees also knowingly received a financial benefit from participating in a commercial hotel-operating venture at the Subject Days Inn Locations (hereinafter "**Venture 2**").

186. The Wyndham Brand Defendants and Franchisees had a longstanding business relationship pursuant to which they jointly participated in operation of the Subject Days Inn Locations with a shared goal of maximizing revenue, including gross room revenue.

187. The Wyndham Brand Defendants and Franchisees, through their respective roles in hotel operations as described above, facilitated widespread sex trafficking at the Subject Days Inn Locations by continuing to operate the hotel in a way that they knew or should have known resulted in them benefiting from significant sex trafficking occurring at the Subject Days Inn Locations.

188. Venture 2 was engaged in a violation of the TVRPA through the widespread sex trafficking at the Subject Days Inn Locations, which resulted in Jane Doe (A.A.M.) and other victims being harbored, maintained, and provided in the rooms of the Subject Days Inn Locations. Venture 2 also engaged in a violation of the TVPRA through the actions of Franchisee Defendant who violated the TVPRA as a perpetrator by harboring sex trafficking victims as defined by 18

66

U.S.C §1591(a)(1) and by participating in a criminal trafficking venture as defined by 18 U.S.C §1591(a) (2).

189.    Despite their actual or constructive knowledge that Venture 2 was engaged in violations of 18 U.S.C. §§ 1591(a) and 1595(a), the Wyndham Brand Defendants and Franchisees participated in the venture by continuing to operate the Subject Days Inn Locations in a way that they knew or should have known would lead to further violations of 18 U.S.C. §1591, including the trafficking of (A.A.M.) The Wyndham Brand Defendants provided Franchisee Defendants with operational support, use of trademarks, marketing services, and other resources to operate the Subject Days Inn Locations in a way that they knew or should have known was engaging in violations of 18 U.S.C §1591(a).

## VI.    Franchisee Defendants and the Staff at the Subject Days Inn Locations Named Herein Acted as Actual Agents of Wyndham.

190.    Wyndham is vicariously liable for the acts, omissions, and knowledge of Franchisees and staff at the Subject Days Inn Locations, which are Wyndham's actual agents or subagents.

191.    The Wyndham Defendants subjected Franchisee Defendants to detailed standards and requirements regarding the operation of the Subject Days Inn Locations through the franchising agreements, through detailed written policies and manuals, and through other formal and informal protocols, directives, mandates, and expectations imposed by the Wyndham Defendants.

192.    The Wyndham Defendants obscure the full extent of control they exercise over the franchisees by treating the manuals and certain policies as confidential and proprietary and prohibiting any public disclosure of those policies and manuals. Upon information and belief, the standards that the Wyndham Defendants imposed on the franchisees:

67

a. did not merely identify quality or outcome standards but instead specifically controlled the means, methods, and tools Franchisee Defendants used at the Subject Days Inn Locations;

b. covered virtually all aspects of hotel operations, including internal operating functions;

c. dictated the specific manner in which Franchisee Defendants and hotel staff must carry out most day-to-day functions at the Subject Days Inn Locations; and

d. significantly exceeded what was necessary for Wyndham to protect its registered trademarks.

193. In addition to the ways described above, upon information and belief, Wyndham exercised and reserved the right to exercise systemic and pervasive control over Franchisee Defendants' day-to-day operation of the Subject Days Inn Locations, including the following ways:

a. The Wyndham Defendants required franchisees and management of franchised hotels to participate in mandatory training programs, both during onboarding and on an ongoing basis. This training covered all aspects of hotel operations, including aspects of hotel operations that go significantly beyond what would be necessary for the Wyndham Defendants to protect their registered trademarks;

b. The Wyndham Defendants provided training for hotel management and select hotel staff on-site at the Subject Days Inn Locations;

c. The Wyndham Defendants required all hotel staff to participate in training it created through an online learning platform it controlled and maintained;

d. The Wyndham Defendants controlled training provided by franchisees to hotel staff by dictating the content of that training, providing required content for that training, and dictating the training methods used;

e. The Wyndham Defendants retained sole discretion to determine whether all training had been completed satisfactorily;

f. For certain products and services that franchisees were required to purchase to operate the Subject Days Inn Locations, the Wyndham Defendants designated approved vendors and prohibited franchisees from purchasing goods and services from anyone other than an approved vendor;

g. The Wyndham Defendants required franchisees to sign a technology agreement governing the terms under which franchisees must procure and use technical services and software while operating the Subject Days Inn Locations. Franchisees

68

were required to install, and use certain brands, types, makes, and/or models of hardware, software, peripheral equipment, and support services to perform internal operating functions at the hotel;

h.  The Wyndham Defendants set required staffing levels for the Subject Days Inn Locations;

i.  The Wyndham Defendants established detailed job descriptions for all positions at the Subject Days Inn Locations and drafted numerous, detailed policies that referenced these positions and dictated which positions must perform which tasks and how they must do so;

j.  The Wyndham Defendants set requirements for the hiring process used by franchisees and oversaw employee discipline processes and termination decisions;

k.  The Wyndham Defendants provided benefits for employees of franchised hotels;

l.  The Wyndham Defendants required Franchisees to use a customer resource management program maintained and operated by the Wyndham Defendants;

m.  The Wyndham Defendants controlled channels for guests to report complaints or provide feedback regarding the Subject Days Inn Locations and directly participated in the response and/or supervised the response to customer complaints or other feedback. The Wyndham Defendants retained the right to provide refunds or other compensation to guests and to require Franchisees to pay associated costs;

n.  The Wyndham Defendants generated reports and analysis of guest complaints and online reviews for the Subject Days Inn Locations;

o.  The Wyndham Defendants required Franchisees to use a Guest Relations Application owned, operated, and maintained by the Wyndham Defendants to manage all guest data and information. The Wyndham Defendants could use the backend of this system to analyze data and generate reports;

p.  The Wyndham Defendants set detailed requirements for insurance that franchisees must purchase and retain the right to purchase insurance for Franchisees and to bill franchisees directly for that insurance if the Wyndham Defendants determined that the franchisees have not purchased adequate insurance;

q.  The Wyndham Defendants regularly audited the books and records of Franchisees;

r.  The Wyndham Defendants conducted frequent and unscheduled inspections of the Subject Days Inn Locations;

s.  The Wyndham Defendants retained the right to issue fines, require additional training, to impose and supervise implementation of detailed corrective action plans, and to take other steps up to and including termination of the franchising agreements if franchisees violated any of the Wyndham Defendants' detailed rules,

69

expectations, protocols, or policies, including those that governed day-to-day operations of the Subject Days Inn Locations;

t.   The Wyndham Defendants controlled all marketing for the Subject Days Inn Locations and prohibited Franchisees from maintaining any online presence unless specifically reviewed and approved by the Wyndham Defendants;

u.   The Wyndham Defendants imposed detailed recordkeeping and reporting requirements on Franchisees regarding virtually all aspects of hotel operations;

v.   The Wyndham Defendants supervised and controlled day-to-day operations of the Subject Days Inn Locations through detailed information and extensive reports that it obtained through the property management system and other software systems it required Franchisees to use; and

w.   The Wyndham Defendants retained the virtually unlimited right to revise policies or adopt new requirements for the day-to-day aspects of hotel operations.

194.   Upon information and belief, Wyndham Brand Defendants had the right to and did enforce its control over Franchisee Defendants through various methods, including:

a.   the right to conduct detailed inspections of the subject properties;

b.   monitoring or auditing the Franchisee Defendants for compliance with policies and expectations;

c.   directing Franchisee Defendants to take specific steps to come into compliance with detailed and exacting standards regarding day-to-day operations;

d.   mandating training and education for franchisees and/or hotel staff;

e.   employing consultants or field agents to become involved in the day-to-day operations of franchised hotels;

f.   the right to impose fines or penalties;

g.   the right to impose additional conditions on franchisee or to restrict or limit its right to provide goods and services; and

h.   the right to terminate the franchise agreement for failure to comply with policies that govern the means and methods used for day-to-day operations.

195.   The Wyndham Brand Defendants are also vicariously liable for Franchisee Defendants and the hotel staff because, as further described above, they retained and exercised

70

control over the specific instrumentalities and aspects of operations that caused Jane Doe (A.A.M.)'s harm, including but not limited to reservations of rooms, hotel security, and detection of and response to suspected sex trafficking. They Wyndham Brand Defendants had the right to exercise detailed, day-to-day control over and involvement in these areas. It also regularly and closely monitored these areas.

### VII. Wyndham Brand Defendants are jointly responsible for the trafficking of Jane Doe (A.A.M.)

196. All the Wyndham Brand Defendants were participants in a joint venture, which involved a common enterprise, profit-sharing, a community of interests, and joint rights of control and management, and are vicariously liable for the violations of the other participants in the joint venture.

197. Upon information and belief, operation of the subject properties was part of a single unified operation by Wyndham Brand Defendants. Upon information and belief, all Wyndham Brand Defendants shared a common parent company, were subject to joint control, and operated as an integrated enterprise and/or as alter-egos. Upon information and belief, Wyndham Brand Defendants acted jointly to own, operate, control, manage, and supervise the subject properties. As an integrated enterprise and/or joint venture, Wyndham Brand Defendants were separately and jointly responsible for compliance with all applicable laws.

### VIII. Defendants are Jointly and Severally Liable for Jane Doe (A.A.M.)'s Damages.

198. The venture or ventures in which each Defendant participated were direct, producing, and proximate causes of the injuries and damages to Jane Doe (A.A.M.).

199. Under the TVPRA, Defendants are jointly and severally liable for all damages that a jury awards to Jane Doe (A.A.M.) for past and future losses she suffered as a proximate result of her sexual exploitation and trafficking.

**CAUSE OF ACTION—SEX TRAFFICKING UNDER THE TVPRA**

200.   Jane Doe (A.A.M.)  incorporates all previous allegations.

I.   **Count 1: Perpetrator liability under 18 U.S.C §1595(a) based on violation of 18 U.S.C §1591(a) (Franchisee Defendants)**

201.   Jane Doe (A.A.M.) is a victim of sex trafficking within the meaning of §1591 and 1595(a) and is thus entitled to bring a civil action under 18 U.S.C §1595(a) against the "perpetrator" of any violation of the TVPRA.

202.   Franchisee Defendants are perpetrators within the meaning of 18 U.S.C §1595(a) because Franchisee Defendant:

   a.   violated 18 U.S.C §1591(a)(1) when, through the acts and omissions described throughout this Complaint, it harbored individuals (including Jane Doe (A.A.M.) knowing or in reckless disregard of the fact that the victims would be caused, through force, coercion, or fraud, to engage in commercial sex acts while at its respective hotel property; and

   b.   violated 18 U.S.C §1591(a)(2) when, through the acts and omissions described throughout this Complaint, it knowingly received financial benefit by knowingly assisting, supporting, or facilitating a venture that was engaged in violations under 18 U.S.C §1591(a)(1) at its respective hotel properties.

203.   Violations of 18 U.S.C §1595(a) by Franchisee Defendants as "perpetrators" operated, jointly, with other unlawful acts and omissions alleged in this Complaint, to cause Jane Doe (A.A.M.) to suffer substantial physical and psychological injuries and other damages because of being trafficked and sexually exploited at the Defendants' hotel properties

II.   **Count 2: Beneficiary Liability under §1595 (a) of the TVPRA. (All Defendants)**

204.   Jane Doe (A.A.M.) is a victim of sex trafficking within the meaning of 18 U.S.C §§ 1591 and 1595(a) and is thus entitled to bring a civil action under the "beneficiary" theory in 18 U.S.C §1595(a) against anyone who knowingly benefited from participation in a venture that

the person knew or should have, with reasonable diligence, known was engaged in a violation of the TVPRA.

205.   Jane Doe (A.A.M.) is a victim of sex trafficking within the meaning of 18 U.S.C §§ 1591 and 1595(a) and is thus entitled to bring a civil action under the "beneficiary" theory in 18 U.S.C §1595(a) against anyone who knowingly benefited from participation in a venture that the person knew or should have, with reasonable diligence, known was engaged in a violation of the TVPRA.

206.   All Defendants are liable as beneficiaries within the meaning of 18 U.S.C. § 1595(a) because, as further described above, each Defendant knowingly benefitted, by receiving additional revenue and other benefits, from its participation in a venture the Defendants knew or should have known was engaged in a violation of the TVPRA.

207.   **Venture 1:** Through acts and omissions more fully described throughout this Complaint, each Defendant received a financial benefit from participating a venture with sex traffickers, including Jane Doe (A.A.M.)'s trafficker. Each Defendant violated the TVPRA through its participation, as a beneficiary, in Venture 1 as follows:

   a. Venture 1 resulted when Defendants developed and maintained a continuous business relationship and implicit understanding with sex traffickers at the Subject Days Inn Locations by renting them hotel rooms and providing them related services despite the fact that each Defendant knew or should have known these traffickers were using the Subject Days Inn Locations to engage in violations of 18 U.S.C §1591(a)(1) and 18 U.S.C §1591(a)(2), including the trafficking of (A.A.M.)

   b. This venture violated the TVPRA through the conduct of the traffickers who repeatedly exploited victims, including (A.A.M.), in the rooms of the Subject Days Inn Locations.

   c. Each Defendant knew or should have known Venture 1 engaged in violations of the TVPRA.

   d. Each member of Venture 1 pursued the purpose of generating revenue through this continuous business relationship. Traffickers (including (A.A.M.)'s trafficker) rented rooms to earn profits by exploiting trafficking victims (including (A.A.M.)). Each Defendant received a financial benefit every time a trafficker rented a room.

73

e. Each Defendant participated in the venture by continually renting rooms to traffickers, creating a favorable environment for trafficking, and providing a venture where traffickers could continue to continue their sexual exploitation with minimal risk of detection and disturbance, all the while ignoring the obvious signs of trafficking (including (A.A.M.)'s trafficking).

208. **Venture 2**: Through acts and omissions more fully described throughout this Complaint, the Wyndham Defendants received a financial benefit from participating in Venture 2 with Franchisee Defendants operating the Subject Days Inn Locations. Each of the Wyndham Defendants violated the TVPRA through participation, as a beneficiary, in Venture 2 as follows:

a. Venture 2 is a commercial venture that resulted from the business relationship between each Wyndham Defendant during its respective time as franchisor for the Subject Days Inn Locations and Franchisee Defendants to operate the Subject Days Inn Locations with a common objective of maximizing revenue at the hotels, including gross room revenue.

b. The venture violated the TVPRA through the widespread sex trafficking that occurred at the Subject Days Inn Locations, including the trafficking of (A.A.M.) This venture also violated the TVPRA through the conduct of Franchisee Defendants, who violated 18 U.S.C §1591(a) as a perpetrators.

c. Each Wyndham Defendant, at the relevant time, knew or should have known Venture 2 was engaged in violations of the TVPRA.

d. Each Wyndham Defendant knowingly benefited from this venture through the management fees, royalty fees, reservation fees, marketing fees, and other ancillary fees from the operation of the Subject Days Inn Locations, which increased every time a room was rented including rooms rented to traffickers.

e.  Each Wyndham Defendant, at the relevant time, participated in this venture by (1) continuing the ongoing business relationship with Franchisee Defendants despite actual or constructive knowledge the hotel was facilitating sex trafficking; (2) directly involving themselves in and supporting aspects of hotel operations that they knew or should have known were facilitating trafficking at the hotel; and (3) continuing to lend the perceived legitimacy of their brand and provide marketing services for the hotel after they knew or should have known the venture was engaged in violations of the TVPRA.

209. The ventures in which each Defendant participated were a direct, producing, and proximate cause of the injuries and damages to Jane Doe (A.A.M.).

### III.    Count II: Vicarious Liability for TVPRA Violations. (Wyndham Defendants)

74

210. Franchisee Defendants acted as the actual agent of its respective Franchisor Defendants when operating its respective hotel property.

211. Through the acts and omissions described throughout this Complaint, Franchisor Defendants exercised or retained the right to exercise systematic and day-to-day control over the means and methods used by its franchisees to operate its respective hotel property.

212. Under the TVPRA and the federal common law, a principal is vicariously liable for the violations of its actual agents and its subagents.

213. As a result of the relationship between Franchisee Defendants and Wyndham Defendants, Franchisors are vicariously liable for the acts of Franchisees, including at the Subject Days Inn Locations. Factors that support this allegation are that Franchisors shared profits, standardized employee training, standardized and strict rules of operations, Franchisors controlled pricing and reservations, regularly conducted inspections, operational support and control, and other acts described above. Finally, Franchisors had the right to terminate any franchisee that failed to comply with the requirements promulgated by Franchisors. Thus, Franchisors retained control, or the right to control, the mode and manner of work contracted for.

214. As alleged above, Franchisee Defendant is directly liable to Jane Doe (A.A.M.) for violations of the TVPRA, both as a perpetrator under 18 U.S.C §1591(a) and as a beneficiary under 18 U.S.C §1595(a). The Wyndham Defendants are vicariously liable to Jane Doe (A.A.M.) for those same violations.

215. Each Defendant's failure to train and supervise their agents and employees, which was unreasonable in light of the known risk of sex trafficking at the Subject Days Inn Locations, enabled and contributed to the sex trafficking of (A.A.M.).

**DISCOVERY RULE**

216. To the extent Defendants assert an affirmative defense of limitations, Jane Doe (A.A.M.) also invokes the continuing tort doctrine because this lawsuit arises out of a pattern of continuous and ongoing tortious conduct by Defendants, individually and in concert, across the subject locations.

217. Jane Doe (A.A.M.) was subject to continuous trafficking at the subject hotel through at least December 2014, which is not more than 10 years before Jane Doe (A.A.M.) filed this lawsuit.

218. This continuous trafficking resulted from Defendants' continuous facilitating of trafficking at the subject hotel and Defendants' ongoing venture with one another and with criminal traffickers.

## DAMAGES

219. Wyndham and Franchisee Defendants' acts and omissions, individually and collectively, caused Jane Doe (A.A.M.) to sustain legal damages.

220. Wyndham and Franchisee Defendants are joint and severally liable for all past and future damages sustained by Jane Doe (A.A.M.).

221. Jane Doe (A.A.M.) is entitled to be compensated for personal injuries and economic damages, including:

   a. Actual damages (until trial and in the future);

   b. Incidental and consequential damages (until trial and in the future);

   c. Mental anguish and emotional distress damages (until trial and in the future);

   d. Lost earnings and lost earning capacity (until trial and in the future);

   e. Necessary medical expenses (until trial and in the future);

   f. Life care expenses (until trial and in the future);

g.  Physical pain and suffering (until trial and in the future);

h.  Physical impairment (until trial and in the future);

i.  Exemplary/Punitive damages;

j.  Attorneys' fees;

k.  Costs of this action; and

l.  Pre-judgment and all other interest recoverable.

## JURY TRIAL

222.    Jane Doe (A.A.M.) demands a jury trial on all issues.

## RELIEF SOUGHT

223.    WHEREFORE, Jane Doe (A.A.M.) prays that this case be set for trial before a jury and that, upon a final hearing of the cause, judgment be entered for Jane Doe (A.A.M.) against all Defendants jointly and severally for the actual, compensatory, and punitive damages as the evidence may show, and the jury may determine to be proper, together with the costs of suit, prejudgment interest, post-judgment interest, and such other and further relief to which Jane Doe (A.A.M.) may, in law or in equity, show herself to be justly entitled.

Respectfully submitted,

**THE LOCKS LAW FIRM**

*/s/ Francesca A. Iacovangelo*
Francesca A. Iacovangelo, Esq.
601 Walnut Street, Suite 720 E
Philadelphia, PA 19106
(215) 893-3454
(215) 893-3444 Facsimile
fiacovangelo@lockslaw.com

**ATTORNEYS FOR PLAINTIFF**

77